STATE of Missouri, Respondent,

v.

Cletus Edward WHITEAKER, Appellant.

No. 56702.

Supreme Court of Missouri,
Division No. 1.

Sept. 10, 1973.

Motion for Rehearing or to Transfer to
Court en Banc Denied Oct. 8, 1973.

John C. Danforth, Atty. Gen., Jefferson City, Charles B. Blackmar, Sp. Asst. Atty. Gen., St. Louis, for respondent.

Kranitz & Kranitz, Theodore M. Kranitz, St. Joseph, for appellant.

BARDGETT, Presiding Judge.

Cletus Edward Whiteaker was found guilty of murder in the second degree by a jury which assessed punishment at 10 years imprisonment. The court entered judgment and sentence accordingly and defendant appealed prior to January 1, 1972. This court has jurisdiction. Art. V, Sec. 3, Const. of Mo. 1945 as amended, V.A.M. S.

At about 5:30 p. m. on Friday, March 20, 1970, Betty Jean Whiteaker, defendant's estranged wife, was shot and killed in Gallatin, Mo. Defendant was charged with first degree murder and, as stated, was convicted of second degree murder. Defendant testified but as a result of amnesia had no memory for the event. Appellant has briefed nineteen points on this appeal. The facts necessary to the resolution of some of defendant's points will be

stated in the resolution of the particular point.

Defendant and deceased were married in 1961 and in January 1970 the deceased left defendant and filed suit for divorce March 6, 1970. In the latter part of 1969 decedent and one Curtis Kohler became intimate. Defendant tried to get deceased to return home but she refused even to talk to him.

The .38 caliber revolver used to shoot the deceased was owned by Curtis Kohler. Kohler had left the gun in the car of Jack Wales in December, 1969. Wales gave the gun to one Rodney Buntin in December, 1969 or early January, 1970. Buntin owned the Uptown Grill in Cameron, Mo., and he put the gun in the storeroom of his grill, along with a shirt and a pair of trousers, at a time when the deceased, Betty Whiteaker, was employed at Buntin's Grill and she could have seen the gun. The defendant patronized Buntin's Grill during this same time. The door to the storeroom was unlocked. Buntin testified he noticed the gun and clothes were missing from the storeroom sometime in early January, 1970. He did not know who removed them.

On March 20, 1970, the day of the shooting, Betty Whiteaker had spent most of her time with Marjorie Taylor, with whom Betty had been living for several weeks. At about 11:00 a. m. on that date decedent and Marjorie were in Buntin's tavern in Cameron while defendant was working there. Nothing untoward took place. At about 5:20 p. m. decedent and Marjorie arrived at the Submarine Tavern in Gallatin and sat on stools at the bar. Shortly thereafter Kohler came in and sat next to decedent. Defendant then came into the tavern and either sat or stood next to Kohler and ordered a beer. Defendant attempted to talk with decedent but she told Marjorie Taylor she wanted to leave. The last thing defendant remembers is starting to drink his beer until at a point in time when he was out in the street with a number of men around him, which was after the shooting.

Marjorie Taylor and decedent left the Submarine and defendant went with them. They walked to Taylor's car and Taylor got into the driver's seat. Decedent began getting into the passenger seat on the right side of the car. Decedent began to close the door but defendant prevented her from doing so and a struggle ensued. Decedent's purse was on the front seat between Taylor and her and Marjorie Taylor thought the purse might have been large enough to hold the pistol, but wasn't certain of this. The right front door was fully open. As the decedent and defendant struggled a shot went off breaking the glass in the right front door window outward. Taylor testified defendant then pulled decedent out of the car; that decedent was "wrestling" defendant down the street but that decedent's movements could have been a twitching, a convulsing or struggling. Both defendant and decedent were upright and, for the most part, face to face. A second shot went off and decedent dropped to the street. Defendant then said, "If I can't have you—" and fired a third shot at decedent's head from a distance of about two feet.

Another witness, Mrs. Vernitta Sailor, was in her apartment when she heard loud talking and thought she heard a shot. She went to the window and saw defendant and decedent struggling and trying to break defendant's hold on her. Mrs. Taylor was screaming. While defendant and decedent were struggling, the defendant shot at the decedent. The decedent fell onto the street and defendant paused and then shot her again. The witness saw a gun in defendant's hand and smoke from the gun when the second and third shots were fired. Defendant then ran to a car. Another man (Curtis Kohler) was walking fast down the street. He looked at the deceased and ran to the defendant's car. Then the witness heard a fourth shot and saw the gunsmoke but didn't know who fired it.

Curtis Kohler testified that he left the Submarine a short time after defendant,

decedent and Taylor and saw decedent lying in the street. He saw defendant running, so Kohler ran after him and caught defendant when defendant got into the car. Defendant pulled a gun up in his right hand and said, "Goddam you, Curt, get out of here or you will get it, too." Defendant fired but Kohler was not struck. Kohler took the gun from defendant and defendant said, "Go ahead. It don't make no difference now anyway."

Defendant testified that he drank about seven beers between about 9:00 a. m. and the time he went into the Submarine Tavern; that he had never seen the murder weapon; that he never owned a gun, and that he had not been looking for decedent that day. During that day defendant and four others had made the rounds of several taverns in various neighboring towns as was usual for him and other construction workers to do on off days. The four men who accompanied defendant testified they observed no weapon on defendant's person all day. There was testimony that defendant's reputation was that of a peaceful, nonviolent person.

Sheriff Appley of Daviess County testified he came to the scene and saw decedent's body lying on a drain grate in the street. There was blood around the body. There was no pulse and he considered her dead. He took the pistol from Kohler. It contained two unexpended bullets and four empty shells. The gun was a .38 caliber Smith and Wesson with a four to four and one-half inch barrel and was eight inches long overall. In his opinion the gun was too large to have been wholly inserted into decedent's purse due to the other items that were in the purse.

A complete autopsy was not performed. The body was examined by Dr. H. W. Bailey who testified he observed two wounds in the right side of the head; there were powder burns surrounding one wound; one of the bullets went into the cerebrum and this caused the death; there was an exit hole on the left side of the face and another hole on the left side where a bullet was removed from the skull.

Mr. Steve Helton, a mortician in Gallatin, Missouri, examined the body, together with Virgil Strong, the coroner, and removed a lead slug from the head of the deceased.

Lt. Miller of the State Highway Patrol testified the slug was most probably fired from the .38 caliber pistol.

Appellant's first point is that the jury panel was not summoned and certified in accordance with Sections 494.250 and 494.-280, RSMo 1969, V.A.M.S., and, therefore, was not lawfully constituted and certified and the trial court erred in overruling the challenge of defendant to the array.

■ It appears that certain technical procedural requirements of the stated statutes were, perhaps, not fully complied with in summoning the January 1971 Term petit jurors. No prejudice to defendant is shown and defendant withdrew his challenge to the array and waived any objections to the jury panel. Thereafter defendant attempted to withdraw his withdrawal and waiver but the court refused to permit him to do so. The court did not abuse its discretion. The point is overruled.

Defendant's second point asserts the trial court erred in overruling defendant's motion for discovery and inspection of the .38 caliber revolver and all bullets and slugs recovered after the firing of the revolver on the occasion in question.

Defendant's point three is that he was denied the right to have the revolver, cartridges and cartridge casings preserved and protected by the state for the purpose of discovering alleged material evidence, such as fingerprints and cosmetic residue.

Defendant asserts that it was the theory of the defense that the deceased had the revolver in her purse, in her pocket or on the floor of Taylor's automobile; that when defendant tried to get deceased to

leave the car and talk to him, she grasped the gun with her left hand while trying to close the door with her right hand; that the gun went off as a reflex action to deceased pulling the door with her right hand; that the bullet entered her skull through the left maxilla and exited at the right parietal continuing through the front right auto door window; that this shot was not necessarily fatal and that the second shot during the struggle on the street might have inflicted an undiscovered mortal wound, which, according to defendant's theory, would constitute an accidental homicide.

The Trooper took the gun, cartridges and the lead slug that were removed from the deceased's head to headquarters in Jefferson City and turned them over to Lt. Miller of the Highway Patrol laboratory on March 23, 1970. A fingerprint test was not requested and none was done. Lt. Miller's notes indicated that ballistics, blood and makeup comparison tests were requested. The evidence does not show who made the request. There were no blood or makeup comparison tests done. A ballistics test was performed.

■ In view of the extensive handling of the revolver and shells, the question of whether or not a fingerprint or cosmetic test could have been productive, if done, is purely speculative. The motion for discovery and inspection was filed June 10, 1970, almost three months after the homicide. The granting or refusing to grant the motion was, in these circumstances, discretionary with the trial court. There is no showing that the denial of the motion rendered defendant's trial fundamentally unfair. The trial court did not abuse its discretion in overruling the said motion. State v. Aubuchon, 381 S.W.2d 807 (Mo. 1964). Point II is overruled.

There is no evidence whatever that the state deliberately suppressed any evidence nor that it intentionally spoiled evidence. State v. Thompson, 396 S.W.2d 697 (Mo.

1965) is not in point. Point III is overruled.

Defendant's Point IV is that the trial court erred in overruling defendant's motion to require the exhumation of the deceased's body in order that an autopsy to determine the cause of death could be done.

On June 10, 1970, defendant filed a motion to require exhumation of the deceased's body for a pathological examination by Dr. Angelo Lapi, a pathologist, for the purpose of determining the cause of death; the points of entry and exit of any bullets and the angle through the body that each bullet traveled. This motion was overruled October 1, 1970.

Defendant contends the cause of death remains a mystery and the court erred in refusing to order the body exhumed. Dr. Lapi testified for defendant during the trial in January, 1971. In answer to a hypothetical question put by defense counsel in which the bullet wounds to the head of the deceased were hypothesized the doctor stated he could not determine the cause of death. He stated an autopsy would be necessary to determine the cause of death. Defense counsel made an offer of proof that an autopsy could still be done at trial time and it would reveal the entrance and exit wounds and the cause of death, and again moved the court to order the body exhumed. The court sustained the state's objection to the offer of proof and overruled the motion to exhume the body.

A review of the record reveals there was substantial evidence that there were two entrance bullet wounds on the right side of the head, one below the cheekbone and the second closer to the top of the head, on the right side of the forehead, and one exit wound in the left side of the head. There was another hole in the left side of the head through which a bullet had been removed. Dr. Bailey testified that one of the bullets went through the cerebrum of the brain and this caused the death.

The question of the defendant's right to have a body exhumed for a postmortem examination in a criminal case does not appear to have been previously ruled upon in this state. Cases from other states cited by defendant involve factual situations in which the guilt or innocence of the defendant could not be established without exhuming the body. This is not the situation in this case. Here, there was eyewitness testimony to the entire matter and substantial evidence that the death was caused by the shots fired from the .38 caliber revolver and that the defendant is the one who fired those shots.

The rule stated at 22 Am.Jur.2d, p. 568, Section 19, as follows, is sound: "The right of relatives of a deceased person to have his corpse remain undisturbed after burial must yield to the public interests, and in a prosecution for homicide, the exhumation of the victim's remains may be ordered on the application of the state or of the defendant where it appears to be absolutely essential to the administration of justice. Thus, where the question of the guilt or innocence of the accused cannot be determined except by exhumation and autopsy of the body of the deceased, the court may and should order the disinterment even against the will of his relatives, and even though there is no statute specifically authorizing such proceedings. However, whether exhumation will be allowed is a discretionary matter for the court.

"An application by the defendant in a criminal prosecution for an exhumation and autopsy should be made before the trial, and a denial of such application after the trial is not error, especially where no valid reason for the delay is given."

There were two eyewitnesses to the events of this homicide, each of whom saw a portion of the occurrence. There is no direct evidence that the deceased had the revolver in her possession at any time. There is no evidence that the shot that went through the car door window struck the deceased at all. The evidence is to the contrary. Mrs. Taylor and Mrs. Sailor both saw the deceased and defendant struggling after the first shot was fired. As to the second shot, Mrs. Sailor actually saw the gun in defendant's hand and saw the gun discharged in the direction of the deceased; both ladies saw the deceased fall to the pavement immediately after that second shot was fired and saw the deceased lay motionless on the ground; Mrs. Taylor then heard the defendant say "If I can't have you . . ." and then both witnesses saw the defendant point the gun at the deceased's head and fire a third shot.

The revolver was taken from defendant by Kohler immediately after defendant said to Kohler "Goddam you, Curt, get out of here or you will get it, too." Kohler then gave the weapon to Sheriff Appley. The Sheriff took no precaution to preserve fingerprints in handling the gun and later that day turned the revolver and the two loaded and four spent cartridges over to Trooper Jefferson of the State Highway Patrol.

■ The factual situation in the instant case does not demonstrate that exhuming the body was absolutely necessary to the fair administration of justice. It was a matter for the trial court's discretion and that court did not abuse the discretion vested in it. The point is overruled.

Appellant's fifth point is the court erred in refusing defendant's offer of proof to the effect that Dr. Lapi would testify that an autopsy was needed to determine the cause of death and that it was still feasible at trial time to do an autopsy.

This court has considered the offer of proof in considering Point IV. The point is overruled.

■ Defendant's Point VI is that the court erred in refusing to permit defendant to adduce evidence on the availability of qualified pathologists, after permitting the state to introduce such evidence over defendant's objection.

This was a collateral matter and no offer of proof was made and, therefore, the court did not know what the testimony would be. The point is overruled.

■ Point VII is that the state failed to establish the corpus delicti in that the element of cause of death was left to speculation and the criminal agency of defendant was not established by evidence.

In State v. Bass, 251 Mo. 107, 157 S.W. 782, 787 (1913), cited by defendant, the court held the corpus delicti consisted of establishing by evidence that, first, the deceased died from the effects of the wound and, second, that the wound was unlawfully inflicted by the defendant.

The evidence here was sufficient from which the jury could find that the deceased died from gunshot wounds unlawfully inflicted by defendant. The point is overruled.

Point VIII is that the physical evidence failed to establish the guilt of defendant of any offense beyond a reasonable doubt. The court holds that the evidence was sufficient to permit the jury to find defendant guilty beyond a reasonable doubt. This point is overruled.

■ Defendant's Point IX asserts the court erred in sustaining the state's objection to the admission into evidence of defendant's statement to Sheriff Appley and in sustaining the state's objection to the use of certain model cars in connection with a plot of the scene.

The substance of defendant's statement to Sheriff Appley was that he was having trouble with his wife; that the "big fellow" in the tavern had been taking her out; that defendant asked deceased to talk to him and he thinks she came out of the tavern; that he didn't know his wife was in the tavern when he went in; that he knows nothing about the shooting and that he was agreeable to taking a breathalyzer test.

Practically all of the above was testified to by defendant, Sheriff Appley and other witnesses during the trial. The point does not warrant an exploration of the law relating to the admissibility of a defendant's statement in defendant's behalf. It simply was not prejudicial and has no merit in this case. The same is true concerning the use of the model automobiles. The point is overruled.

Defendant's Point X is that the court erred in admitting Exhibit 3 (a colored photo of the right side of deceased's face showing a hole in her cheek and blood around her ear); Exhibit 4 (a colored photo of the top right side of deceased's head and right cheek showing a hole in the top right side of deceased's head, a hole in the right cheek and a small amount of blood) and Exhibit 5 (a colored photo of the left side of her face showing a hole in her left cheek, an incision in the right side of her neck and a small amount of blood). All photos were 4″ x 4″ in size.

Defendant contends these exhibits were inflammatory.

■ Defendant examined and cross-examined witnesses extensively concerning the nature and location of wounds and cause of death. The photos, while not pretty, are not gory. They were admissible to show the nature and location of the wounds. The point is overruled.

■ Point XI is that the court erred in permitting the state to cross-examine defendant beyond the scope of direct examination.

Defendant denied possession of the gun immediately prior to the shooting and stated he had no recollection of the event at all. The state asked defendant a series of questions relating to whether or not he *could* have shot his wife. Defendant objected several times on the grounds that the cross-examination called for speculation, that it was beyond the scope of the direct and that the questions were repeti-

tions. The court finally sustained the objection on the grounds that the questions were repetitious.

Section 546.260, RSMo 1969, V.A.M.S., authorizes cross-examination of a defendant in a criminal case to any matter referred to in direct examination. The shooting of the deceased was referred to in the direct examination and was central to the entire case. The cross-examination did not violate the statute. The point is overruled.

Point XII is that "the conduct of the prosecuting attorney in his questioning and remarks was so prejudicial as to bias and prejudice the jury beyond the power of the trial court to cure by sustaining objections or by reprimand."

The various instances recited in appellant's brief of alleged misconduct on the part of the prosecutor need not be set forth here. It appears that the prosecutor did disregard the court's ruling on several occasions and he should not have done so. The defendant does not appear to be complaining of any error on the trial court's part, as eight of defendant's nine objections were sustained and defendant did not request a mistrial. This matter was presented to the trial court in defendant's motion for new trial and overruled. The trial court was in a better position to assess the impact of the prosecutor's conduct and did not abuse its discretion in refusing to grant a new trial. The point is overruled.

■ Point XIII is that the trial court erred in permitting the prosecutor, over objection, to comment improperly on the fact that defendant testified in his own behalf, and to draw therefrom an inference of guilt.

In closing argument defense counsel told the jury that his client was not required to testify but that defendant did not avail himself of the Fifth Amendment and did testify; that defendant answered all questions to the best of his ability and demonstrated that he was a calm, affable, straightforward, honest man.

The prosecutor, in rebuttal argument, commented adversely on defendant's position that he had amnesia by arguing that since defendant had originally denied knowledge of the shooting to the police officer, the defendant was "stuck with that statement and couldn't switch it." Defendant's objection was overruled. Defendant contends that the prosecutor was not entitled to comment on the fact that defendant did testify anymore than he could comment on defendant's failure to testify.

The argument was retaliatory to defense argument and the subject of defendant's credibility was a proper subject of comment.

The defendant objected to the subsequent portion of the state's argument, the objection was sustained, and the jury was instructed to disregard it. No further relief was sought.

The point is overruled.

Point XIV is that the court erred in giving Instruction No. 6, which covered murder in the first degree, second degree murder and manslaughter.

■ Defendant was convicted of murder in the second degree. Defendant's first complaint concerning Instruction No. 6 is to the manslaughter portion of it and is that the word "feloniously" was not used in defining manslaughter but was used in the two murder definitions. It is contended that this could lead the jury to believe that manslaughter was not a felony and would, therefore, dissuade the jury from convicting of manslaughter because it would think it was acquitting defendant of a felony. Defendant agrees that the failure to use "feloniously" in a manslaughter

**420**

instruction is not error. There is no merit to defendant's contention.

Defendant's second complaint concerning the manslaughter portion of Instruction No. 6 is that the only finding it required was the defendant did "shoot and kill [deceased]," whereas the murder portions of the instruction required a finding that the defendant "did make an assault upon [deceased] with a certain loaded pistol and did * * * discharge and shoot said pistol at and upon the body of the said . . . . ." Defendant claims the difference in phraseology diminished the quantum of evidence necessary to convict of manslaughter and confused the jury.

 The manslaughter instruction required the jury to find that defendant "did wilfully, unlawfully, and intentionally shoot and kill etc." This phraseology is simple, clear and unconfused. The point has no merit.

Defendant's third complaint against the manslaughter instruction as part of Point XIV, and defendant's points XV and XVI are basically the same in that defendant asserts the trial court erred in failing to instruct on excusable or accidental homicide.

The evidence has been set forth, supra, and will not be repeated here. There was no evidence to support the submission of excusable or accidental homicide. The points are overruled.

Defendant's seventeenth point is that because of the errors alleged in Points 2, 3, 4, 7, 11, 12 and 13 defendant was deprived of a fair trial and equal protection of the law in violation of Article 1, Sections 2, 10 and 18(a), Const. of Mo. and the United States Constitution, Amendment 14.

The points referred to, supra, have been overruled. Point 17 is also overruled.

Defendant's eighteenth point is that the trial court abused its discretion in (a) refusing to grant defendant credit for the time served in jail awaiting trial, and (b) refusing to permit defendant to prosecute this appeal as a poor person.

Defendant asserts that he served 348 days in jail awaiting trial. The trial court denied defendant credit for jail time while awaiting trial against the ten year sentence. At the time this was done the question of whether pre-trial jail time would be credited against the sentence was discretionary with the trial judge, and the court did not abuse its discretion in this case. Section 546.615, RSMo 1969, V.A.M.S. This section, however, was amended in 1971 so as to require that pre-trial jail time be credited against the sentence and the state has requested the court to consider the applicability of section 546.615, as amended, in view of the court's holding in State v. Reiley, 476 S.W.2d 473 (Mo.1972).

In State v. Reiley, supra, the court held that section 195.200, subd. (1), by which the maximum punishment for the offense of possession of five grams or less of hashish was reduced from twenty years imprisonment to a jail term of not more than one year and/or a fine, was applicable to Reiley because Reiley's conviction was still pending on appeal, and, therefore, not final, at the time section 195.200 became effective and that section 1.160(2), RSMo 1969, V.A.M.S., required that the reduced or lesser maximum penalty be applied to the case.

The instant case presents a situation similar to State v. Reiley in that not only does section 546.615, RSMo, as amended, effective in September, 1971, have the effect of lessening the punishment by reducing the amount of time to be served after conviction by that amount of time spent in jail awaiting trial on the charge, but that statute is also part of the "existing laws" which must govern this case because here, as in Reiley, the case was still pending on the effective date of section 546.615, as amended. Section 1.160(1), RSMo 1969, V.A.M.S., requires all pending "proceed-

ings shall be conducted according to *existing laws*" (emphasis added). Consequently section 546.615, as amended, is applicable to this case.

■ This court holds that section 546.-615, as amended 1971, is applicable to those cases wherein the judgment has not become final prior to September 28, 1971, the effective date of section 546.615, as amended. The defendant is entitled to credit for jail time awaiting trial in this case against his ten year sentence. The court does not definitely know exactly how many days defendant spent in jail prior to conviction, however, the officer required by law to deliver defendant to the Department of Corrections will furnish this information to the Department of Corrections in compliance with section 546.615(3), as amended, and the Department of Corrections will then allow the jail time credit against the sentence.

■ The second contention made in Point XVIII is that the trial court erred in refusing to permit defendant to prosecute this appeal in forma pauperis. This question is largely discretionary with the trial court, which discretion was not abused in this case.

Defendant's nineteenth and last point is that the trial court erred in overruling the motions of defendant (a) for acquittal as developed in points seven and eight of this appeal; (b) for judgment of acquittal; and (c) for new trial; for all the reasons stated in said motions on this appeal.

This point merely cumulates other points previously overruled on this appeal and is, therefore, also overruled.

As modified, with respect to credit for pre-conviction jail time, the judgment is affirmed.

SEILER, J., concurs.

HOLMAN, J., concurs on merits—dubitante on question of allowance of jail time.