STATE of Missouri, Respondent,

v.

Roderick HOLMES, Appellant.

No. 61437.

Supreme Court of Missouri,
En Banc.

Nov. 12, 1980.

As Modified On Court's Own Motion
Dec. 15, 1980.

David V. Bear, Bear, Hines & Thomas, Columbia, for appellant.

John Ashcroft, Atty. Gen., Nancy D. Kelley, Asst. Atty. Gen., Jefferson City, for respondent.

ALDEN A. STOCKARD, Special Judge.

Appellant was found guilty by a jury of capital murder and sentenced to imprisonment for life. He has appealed from the ensuing judgment.

Appellant does not challenge the sufficiency of the evidence. It is sufficient to state that a jury reasonably could find from the evidence that on June 24, 1978 appellant caused the death of Glenn Chambers, age 16, by inflicting multiple stab wounds.

On August 3, 1978 the grand jury of Audrain County, Missouri, returned an indictment charging appellant with murder. What was then Rule 24.01 provided that the indictment should state on its face "the section of the Revised Statutes of Missouri which proscribe the conduct charged, the section of the statutes which fixes the penalty or punishment therefor, and the name and degree, if any, of the offense." Pursuant to this requirement the following was set forth on the upper right hand corner of the indictment: "Murder, 1st degree, section 559.010 Penalty: life imprisonment, section 559.010." However, prior to the date of the commission of the alleged offense § 559.010, which defined conventional murder in the first degree, had been repealed.

A substitute information in lieu of indictment was filed.[1] Appellant does not contend that it does not charge him with capi-

---

1. Apparently the substitute information was lodged with the clerk of the court on August 7, 1978, but leave of court to file it was not then obtained. At a hearing on an application for habeas corpus held on August 10, 1978 the trial court "granted leave to file the substitute information," but the transcript shows it was filed on January 23, 1979.

tal murder in violation of 565.001 RSMo 1978, which was in effect on the date of the alleged murder of Glenn Chambers.

Appellant asserts in his first point that the indictment charged him with "murder in the first degree under § 559.010 RSMo 1969, which was repealed * * * [and] not in effect at the time the offense was allegedly committed," and for that reason the trial court erred in permitting the State "to substitute an information charging defendant with capital murder * * * and proceed to trial thereon without granting [appellant] a preliminary hearing," because as appellant asserts, "the substitute information charged an offense different [from] that originally charged."

In *State v. Jackson*, 594 S.W.2d 623, 624 (Mo.1980), it was ruled that "the erroneous citation of the statute [which proscribed the conduct charged] did not render the indictment * * * a nullity and the correction by way of substitute information was properly allowed." See also *State v. Higgins*, 592 S.W.2d 151, 162 (Mo. banc 1979). Therefore, if as required by then Rule 24.01 the allegations of the indictment contained "a plain, concise and definite written statement of the essential facts constituting" capital murder, as defined in § 565.001 RSMo 1978, the indictment was not a nullity, and the filing of a substitute information which charged the offense of capital murder was permissible.

Section 565.001 RSMo 1978 provides that "Any person who unlawfully, willfully, knowingly, deliberately, and with premeditation kills or causes the killing of another human is guilty of the offense of capital murder." The indictment charged that appellant "feloniously, willfully, premeditatedly, deliberately, on purpose, and of his malice aforethought, and after considering and reflecting on this matter fully and coolly, did make an assault upon Glenn Chambers, with a certain unknown instrument, and then and there intentionally caused the death of Glenn Chambers by stabbing him, and [appellant] intended to take the life of Glenn Chambers and reflected upon this matter coolly and fully before stabbing him

* * *." It is readily apparent that every "essential fact" in the statutory definition of capital murder is contained in the indictment except the allegation that appellant "knowingly" killed or caused the death of Glenn Chambers.

In *State v. Simone*, 416 S.W.2d 96, 98 (Mo.1967), it was stated that "Where a statute defines the criminal offense and sets forth all of its elements, the better practice is for the indictment to follow the language of the statute, but an indictment will not be held insufficient for failure to do so if words of similar import are employed." See also *State v. Harris*, 313 S.W.2d 664 (Mo.1958). Although the indictment in this case did not specifically allege that appellant "knowingly" killed or caused the killing of Glenn Chambers, it did allege that he "willfully" made an assault on Glenn Chambers and that he "intentionally" and "on purpose" caused his death. In *State v. Marston*, 479 S.W.2d 481 (Mo.1972), this court considered the meaning of the word "willfully," and noted that in *State v. Stogsdill*, 324 Mo. 105, 23 S.W.2d 22 (1929), and in *State v. Edwards*, 435 S.W.2d 1 (Mo.1968) it was held to mean "intentionally" and not "accidentally." In *State v. Foster*, 355 Mo. 577, 197 S.W.2d 313, 321 (1946) it was stated that "The word 'wilfully' has often been defined in this State and elsewhere as meaning 'intentionally' or 'knowingly' in defining a criminal offense." See also *State v. Shuler*, 486 S.W.2d 505, 509 (Mo.1972); and *State v. Brown*, 445 S.W.2d 647 (Mo.App.1969).

One cannot do an act "on purpose" without doing it "knowingly," and it is done "knowingly" when it is done "intentionally" or "wilfully." While the indictment did not use the word "knowingly," it did use words having similar import and supplying the same meaning. The indictment was sufficient to charge appellant with capital murder, and since the substitute information in lieu of indictment admittedly charged appellant with capital murder, it did not charge a new offense or an offense different from that charged in the indictment.

Appellant's second point is based on the assumption that the indictment failed to state a charge and was a nullity. He asserts that if that were so then the substitute information was in fact the first "accusatory pleading," and he was tried without being afforded a preliminary hearing.

We have held that the indictment did state a charge of capital murder, and that the substitution of the information did not charge an additional or different offense. Rule 23.02, then in effect, provided that "No preliminary examination shall be required where an information has been substituted for an indictment." See also *Boykins v. State*, 566 S.W.2d 509 (Mo.App. 1978). There is no merit to appellant's second point.

Appellant next asserts that the trial court erred when it admitted in evidence "a paper maché mannequin into which sixty–four holes were drilled and inserted into each hole a red plastic pin to indicate the location of the stab wounds on the body of the deceased, as the mannequin was highly inflammatory, had no evidentiary value, and its only function was to unfairly prejudice the jury."

The mannequin, Exhibit No. 4, has been deposited with this court. However, the plastic pins had been removed, and apparently are not now available. Other plastic pins have been submitted and by affidavit it is stated that they are "substantially identical." Exhibit No. 4, is a headless and armless paper maché form of the human torso. It appears to be the type that is frequently used to display men's shirts. Prior to trial appellant asked for and was granted a protective order that the mannequin not be displayed to the jury "until it is admitted" in evidence.

Dr. John M. Boyce, a pathologist who performed an autopsy on the body of Glenn Chambers, testified that there were multiple small holes in the body, that he and a police officer had prepared Exhibit No. 4, and that it accurately and fairly depicted the location and number of wounds that he was able to identify on the torso of Glenn Chambers at the time of the autopsy.

When Exhibit No. 4 was offered in evidence the trial court left the bench to make an examination of the exhibit in camera before ruling.

Appellant argues that "the cause of death was not disputed," and he cites *State v. Mucie*, 448 S.W.2d 879, 887 (Mo.1979), and quotes therefrom the general statement that, "it is error to admit evidence of an inflammatory nature if it does not reasonably tend to prove or disprove a disputed fact issue." In support of his contention appellant refers to the comment of his counsel made to the court when objecting to the admission in evidence of the Exhibit No. 4 that, "There is no issue about where they [the stab wounds] were located. They were fatal. There is no issue about that. There is absolutely no issue about the fact that Glenn Chambers was killed as a result of these wounds and that they were numerous and multiple."

Appellant entered a plea of not guilty, and the State therefore had the burden of convincing the jury beyond a reasonable doubt as to each and every element of the charged offense, *State v. Mullen*, 528 S.W.2d 517 (Mo.App.1975), which in this case included the fact that Glenn Chambers died as the result of multiple stab wounds which were inflicted by appellant. See *State v. Love*, 546 S.W.2d 441, 452 (Mo.App. 1976). The State also had the burden to prove the alleged intent with which the wounds were inflicted. Appellant may have told the court that no issue of fact existed, but the court was not the trier of the facts, and "The right of the state to offer, and to have received, evidence which is relevant and material to the issue cannot be taken away by an offer for stipulation or by an admission." *State v. Townes*, 522 S.W.2d 22, 25 (Mo.App.1974). See also *State v. Denmon*, 473 S.W.2d 741 (Mo.1971).

As noted the trial court viewed Exhibit No. 4 before it was shown to the jury, and because of the superior vantage point occupied by the trial court for balancing the probative value and prejudicial effect of demonstrative evidence of this type,

it necessarily is vested with a broad discretion in admitting or rejecting such evidence. *State v. Love*, supra at p. 452. Demonstrative evidence which tends to establish any fact in issue or throw light on the controversy and aid the jury in any way in arriving at a correct verdict is admissible within this rule, and if it accurately portrays the event or circumstances sought to be shown, it should not be rejected because by presenting an accurate portrayal it tends to be inflammatory. *State v. Swenson*, 551 S.W.2d 917, 921 (Mo.App.1977). Exhibit No. 4 admittedly was an accurate portrayal of the number and location of the stab wounds. If the showing of their location and number tends to be inflammatory it is because any accurate portrayal, whether presented by oral testimony, or by a photograph, or as in this case by use of a paper maché mannequin, would be inflammatory. Notwithstanding its possible inflammatory nature, the exhibit met every test of probativeness. The exhibit visually demonstrated the nature and location of various wounds inflicted. *State v. Jones*, 515 S.W.2d 504, 506 (Mo.1974); *State v. Wallace*, 504 S.W.2d 67, 72 (Mo.1973); *State v. Whiteaker*, 499 S.W.2d 412, 418 (Mo.1973). It also enabled the jury to better understand the facts elicited from the witnesses, *State v. Crow*, 486 S.W.2d 248, 256 (Mo. 1972); *State v. Perkins*, 382 S.W.2d 701, 704 (Mo.1964), and it corroborated the testimony of the State's witnesses. *State v. Wallace*, supra at p. 72, and *State v. Jackson*, 499 S.W.2d 467 (Mo.1973). In addition Exhibit 4 constituted demonstrative evidence which, if the jury determined that appellant perpetrated the homicide, would aid the jury in determining the intent with which the homicide was committed, and for that reason the jury was in a better position to determine whether appellant should be found guilty of capital murder, second degree murder, or manslaughter, all of which were the subject of an instruction to the jury.

The trial court did not abuse its discretion in admitting into evidence Exhibit No. 4, and in permitting its use as demonstrative evidence.

Appellant's final point is that the court erred in admitting into evidence statements made by him to two deputy sheriffs and to the prosecuting attorney while he was in custody because "the use of these statements violates [his] right to counsel and constitutes a failure to observe that fundamental fairness essential to the very concept of justice."

Prior to trial, but just before the jury voir dire was commenced, appellant filed a motion to suppress statements made to Officer Tom Cline and to Officer Tom Mullen for the reason that he "was not sufficiently informed of his rights as set forth by the United States Supreme Court in the case of *Miranda v. Arizona* * * * and did not knowingly and with understanding waive said rights." He alleged that the use of the statements violated his rights "under the Constitution of the United States Article V, VI and Article XLV, [sic] Section 1, and * * Missouri Constitution Article I, Section 19." The court conducted a hearing in chambers on the issue of the voluntariness of the statements made to Officer Cline after which it expressly found that "the defendant knowingly, intelligently, and voluntarily waived the right to remain silent," that the statement was "voluntarily given," and that "the statement will be admissible." Subsequently, and before the trial started the trial court conducted another hearing out of the presence of the jury as to the voluntariness of the statements by appellant to Officer Mullen, and the court held the statement to have been "a spontaneous, voluntary statement * * * and not as the result of interrogation."

We note here that appellant's motion to suppress was based on the contention that prior to making the statements he had not been given the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[2] In his brief he admits

2. It is true that in his Motion to Suppress reference was made to "Article * * * VI," which we assume was intended to refer to Amendment VI of the United States Constitu-

that prior to making any of the statements he "was advised of his *Miranda* rights," and his contention on this appeal is that the use of the statements violated his constitutional right to counsel.

■ We will consider first the statements made to the prosecuting attorney. We do not find that any such statement was offered in evidence as proof of the fact related. Appellant elected to testify in his behalf, and on cross–examination it was brought out that the prosecuting attorney had talked to him on July 18, 1978. That was after he had been advised of his *Miranda* rights and approximately two weeks before he was charged with any offense.

During cross–examination the prosecuting attorney attempted to impeach appellant by asking whether he had made certain statements to her, but he *denied* making each and every statement except the following: (a) he admitted that he told the prosecutor that he wanted to talk to her alone rather than with his family in the room; (b) he admitted that in the discussion he first brought up the name of Jeannie West; (c) he admitted that he stated that he had only one person who rode from Mexico to Columbia with him. There was no objection to these inquiries on the basis that the use of the statements were made in violation of his right to counsel. Assuming that for some reason it was improper to permit the questions which brought about the above answers, appellant makes no attempt to demonstrate why or in what way they were prejudicial to him. In addition, these statements were used solely for impeachment purposes which was a permissible use. *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). We conclude that this attempted impeachment did not result in a denial of appellant's constitutional right to counsel.

■ We will next consider the statements to Officer Mullen. On June 25, 1978 Officer Mullen took appellant by automobile to Jefferson City for a polygraph test.

There is no question that appellant agreed to make the trip and take the test. Officer Mullen did not question him about the death of Glenn Chambers, but on the return trip they were "talking in general," not "about the case," and appellant stated he "felt embarrassed and he didn't know if he could face Glenn's parents." There was no objection when Officer Mullen testified at trial that appellant made this statement to him. Appellant does not contend on this appeal that he had not previously been adequately advised of his "*Miranda* rights" which included his right to counsel, and appellant does not challenge the finding of the trial court that this statement by appellant to Officer Mullen was "a spontaneous, voluntary statement" which was not "the result of interrogation." We find no denial to appellant of his constitutional right to counsel by use of this volunteered statement.

■ The final statements to consider are those made to Officer Cline. After appellant made the volunteered statement to Officer Mullen, the Officer told him that Officer Cline "was the type of individual he could talk to," that he was a "good person," and he asked appellant "if he would talk with Tom." At the time Officer Cline was the chief deputy sheriff, and he was engaged in the investigation of the death of Glenn Chambers.

On the evening, of June 24, 1978, Officer Cline went to appellant's home and asked him to accompany him to the sheriff's office, which appellant did. Officer Cline testified without objection that in response to questions, appellant related his whereabouts on the previous evening. On the following day after Officer Mullen reported to Officer Cline that appellant wanted to talk to him alone he again talked to appellant. Officer Cline read to appellant the *Miranda* warnings, which included the advice that appellant had the right to talk to a lawyer and to have him present while he was being ques-

tion which among other things guarantees the right of an accused to have the assistance of counsel for his defense. But at trial the claim that use of the statements violated appellants right to counsel was not advanced except as to Officer Cline.

tioned. Appellant acknowledged that he understood his rights, and he stated that he wanted to talk to Officer Cline. He made no objection to the questioning, and he made no request that a lawyer be present. Appellant does not contend that he was not adequately advised of his right to have counsel present if desired, and he does not specifically challenge the findings of the trial court that the statements he made to Officer Cline were "voluntarily given," and that he "knowingly, intelligently, voluntarily waived the right to remain silent."

The record is not clear as to when appellant first was represented by counsel. There is no direct testimony as to this. Officer Cline testified that early on June 25, 1979, appellant's mother had gone to the jail, and he had heard that "she had either retained [Mr. Bear] or was thinking about retaining [him]." At that time Officer Cline was conducting a general investigation of the homicide, and there were no charges filed against appellant. Although appellant was not, technically speaking, under arrest, it may be assumed that he was in custody.

When Officer Cline was asked what appellant said at the second interview, objection was made "for the reason the officer was aware of the fact that the defendant had employed an attorney" and "the officer had been advised an attorney was representing him, and of course, the officer knew [counsel] had a right to be present." The objection was overruled, and the officer then related statements made to him by appellant concerning his activity near the time of the homicide, and he also related some statements which indicated a homosexual relationship with Glenn Chambers.

Appellant relies primarily on *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). We need not review the facts of that case, but there are at least three important differences which result in that case not being controlling. First, in the *Brewer* case the defendant had been arraigned, and in that manner adversary proceedings had commenced. Second, there was no reasonable basis for finding that appellant had waived his right to counsel, or at least the majority so held. Third, the officers knew that appellant had been instructed by counsel not to make any statement, and there was an agreement between the officers and appellant's counsel that there would be no interrogation. These circumstances do not exist in this case. However, in the *Brewer* case it was stated that "the right to counsel granted by the Sixth and Fourteenth Amendments means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him—'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" See also *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972). At the time that appellant made the statements to Officer Cline there had been no judicial proceedings initiated against him. See *Arnold v. State*, 484 S.W.2d 248 (Mo.1972), and *State v. Petrechko*, 486 S.W.2d 217 (Mo.1972). It is also clear that at the time the statements were made the police, including Officer Cline, were engaged in a routine investigation of a homicide which resulted in the death of Glenn Chambers.

In *Kirby v. Illinois*, supra, the court commented: "In this case we are asked to impart into a routine police investigation an absolute constitutional guarantee [right to counsel] historically and rationally applicable only after the onset of formal prosecutorial proceedings. We decline to do so. Less than a year after *Wade* [*United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967)] and *Gilbert* [*Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967)] were decided, the Court explained the rule of those decisions as follows: 'The rationale of those cases was that an accused is entitled to counsel at any "critical stage of the *prosecution*," and that a post–indictment lineup is such a "critical stage."' * * * We decline to depart from that rationale today by imposing a *per se* exclusionary rule upon testimony concerning an identification that took place long before the commencement of any prosecution whatever." The rationale applica-

ble to the right to counsel at a lineup held prior to the commencement of any prosecution applies equally as well to the constitutional right of counsel during routine investigation prior to the commencement of prosecution. See also *Morris v. State*, 532 S.W.2d 455 (Mo. banc 1976). *Brewer v. Williams*, supra, does not provide for a per se rule of exclusion of statements made by appellant to Officer Cline under the circumstances of this case.

In any custodial interrogation appellant was entitled to receive the "*Miranda* warnings" which included the right to counsel and to have counsel present during custodial interrogation. Therefore, if the statements should not have been admitted in evidence it is because the "*Miranda* warnings" were not given, or if they were given, because appellant did not voluntarily and intelligently waive his right to counsel during custodial interrogation.

It is clear that the "*Miranda* warnings" were given to appellant; not only once, but several times prior to the interrogation by Officer Cline, and as previously noted, appellant does not make a specific challenge to the findings of the trial court that the statements were "voluntarily given" and that appellant "knowingly, intelligently, and voluntarily waived the right to remain silent." Our careful review of the record results in the same conclusion as that reached by the trial court.

Appellant was advised of his right to counsel and of his right to remain silent. He knowingly, intelligently, and voluntarily waived that right. Under the circumstances of this case the admission into evidence of the statements made by him to Officer Cline did not violate any constitutional right to counsel.

The judgment is affirmed.

RENDLEN, WELLIVER and HIGGINS, JJ., and WELBORN, Special Judge, concur.

SEILER, J., concurs in separate concurring opinion filed.

BARDGETT, C. J., concurs and concurs in separate concurring opinion of SEILER, J.

MORGAN and DONNELLY, JJ., not sitting.

SEILER, Judge, concurring.

While I concur in the affirming of the judgment of conviction and sentence, I deem it necessary to add the following. The defendant in the case before us was charged with capital murder and was convicted by a jury. The sentence was life without parole or probation for fifty years.

Section 565.014.3(3), RSMo 1978 provides that in cases where the death penalty is assessed, one of the duties of this court is to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." By imposing this duty upon us, the legislature was attempting to comply with the constitutional requirements that the risk of arbitrary and capricious application of the death penalty be minimized and that consideration of the individual circumstances of each offender and each crime be given. *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *State ex rel. Westfall v. Mason*, 594 S.W.2d 908 (Mo. banc 1980). While in this particular case the prosecutor waived the death penalty (without giving any reason or explanation), in order to comply with our statute and make the required comparison, we must know what the facts are in capital murder convictions for which the death penalty was not assessed, as well as in those for which it was.

For this reason, therefore, even though defendant does not challenge the sufficiency of the evidence, it is necessary to make a more complete statement of the facts as to the crime and the defendant.

Defendant, a black man, was twenty-two years of age at the time of trial, which started March 12, 1979. He had a high school education. The defendant was em-

ployed as a nurse's aide at the Ellis–Fischel Cancer Hospital in Columbia, where he worked the night shift. He had pleaded guilty in 1975 to a charge of stealing under $50.00. The victim, Glenn Chambers, also black, was sixteen years of age at his death, June 23, 1978. There was evidence that there was a homosexual relationship between them and that defendant "had been going with" Chambers for approximately five years. On Tuesday, June 20, 1978, three days before the crime, defendant told a witness who rode to work with him that Chambers was "trying to be smart" and he "was going to kill him." Defendant, when asked why, said Chambers had told a lie, but would not say what it was. Defendant said he was going to "make a date" with the victim as if nothing were wrong and then that he and his cousin were going to kill Chambers by stabbing him with an ice pick some sixty odd times.

The next day defendant again said he and his cousin were going to kill Chambers that weekend. The witness told defendant not to kill Chambers as he would surely go to the penitentiary for it.

Chambers was seen getting into defendant's automobile the next evening. Chambers' body was found the next day near the Littleby Creek bridge, face down, on the ground

The doctor who performed the autopsy found sixty–four wounds in the body which he estimated to be one–thirty–second to one–eighth of an inch in diameter. He characterized the type of wound as an ice pick wound. There were nine separate wounds to the heart, one wound through the aorta, one wound to the pulmonary artery, two to the lobes of the liver and multiple wounds to the lungs and other portions of the body. In the doctor's opinion, the nine wounds to the heart were fatal in nature and were the cause of death.

Defendant testified in person. He denied being a homosexual or having any such relationship with the victim. He denied killing or threatening to kill the victim. His defense was an alibi.

The report which we require the trial judge to make in a capital murder case while, of course, showing that no statutory aggravating circumstances were instructed upon and found by the jury (as there was no jury trial except on the guilt or innocence issue), listed under the heading of non–statutory aggravated circumstances indicated by the evidence, the following: "Victim stabbed some 60 times" and that there was no evidence of statutory or non–statutory mitigating circumstances. Under the heading as to whether the victim was physically harmed or tortured the report shows "Yes. Stabbed some 60 times." The trial judge also reported the evidence foreclosed all doubt regarding defendant's guilt and that he (the trial judge) "felt the sentence was acceptable."