**STATE of Missouri,
Plaintiff-Respondent,**

v.

**George MERCER, Defendant-Appellant.**

No. 61797.

Supreme Court of Missouri,
En Banc.

May 11, 1981.

Rehearing Denied June 4, 1981.

2

Cenobio Lozano, Jr., Harrisonville, for defendant-appellant.

John Ashcroft, Atty. Gen., Paul R. Otto, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

HIGGINS, Judge.

George "Tiny" Mercer was convicted by a jury of capital murder, § 565.001, RSMo 1978; the jury fixed his punishment at death, §§ 565.008 and 565.012, RSMo 1978. Judgment was rendered accordingly. He charges errors to the excuse for cause of prospective jurors who voiced objections to consideration of the death penalty; the prosecuting attorney's reference in opening statement and a stipulation concerning a

prior accusation of rape of another victim by defendant; and the cross-examination of defendant with respect to previously excluded evidence. In addition to the review for error, the Court will review the sentence as mandated by § 565.014, RSMo 1978. Affirmed.

I.

The evidence supports defendant's conviction for the murder of Karen Keeton, a 22-year-old white female, in the early morning hours of August 31, 1978. It established that defendant, a 34-year-old white male, was drinking with friends at the Blue Seven Lounge in Grandview, Missouri, the evening before. Karen was working there as a waitress. During the evening, defendant made the comment that he would like to take her to bed. Steven Gardner, a friend of defendant who was acquainted with Karen, went up to the bar to talk to her. He returned a short time later and said he and Karen were going to breakfast and would go to defendant's house afterward. Defendant left with David Gee, another friend, and went to defendant's home in Belton, Missouri, arriving there around 12:30 a. m. John Campbell was at the house babysitting with defendant's ten-year-old daughter. A short time later Gardner and Karen Keeton arrived.

After visiting for some time defendant picked up a sawed-off double-barrelled shotgun, opened it to show the shells, walked over to Karen, tapped her on the head with the gun, and told her to "get her ass upstairs." When she hesitated he grabbed her and pushed her to the stairway. She yelled for Gardner to help. He responded, "Happy Birthday, Tiny," then turned to the others and said, "Seconds." Karen's dress was tossed downstairs with defendant telling Gardner to "put these clothes where they go, you know where they go." Gardner put the clothes in a closet and pocketed the money from her purse.

Defendant later came downstairs; he was naked and had an erection. Gardner went upstairs. Defendant drank beer for awhile,

showered and returned to the table to dry himself at which time he remarked what "a good piece of ass" she was and that he was going to go back and "fuck her in the butt." Several minutes later, Gardner yelled for David Gee to come upstairs. Gee, followed by defendant and John Campbell, complied. Upstairs, defendant told Karen, who was lying naked on the bed, to undress Gee and "start sucking David Gee's dick." She performed as directed. After Gee answered, "Pretty good", to defendant's question about her performance, defendant said, "You leaky cunt, you'd better do it better." When asked how she was doing now, Gee answered, "Better now." Defendant, Gardner and Campbell returned downstairs. At this time, Karen stopped what she was doing, and Gee put his clothes on. Karen asked what was going to happen to her; Gee attempted to reassure her. When Gee returned downstairs, defendant told Campbell to get upstairs so they would all be in it together. Campbell proceeded upstairs and found Karen unclothed. She cried, and Campbell talked with her, trying to console her. He too returned downstairs.

Defendant started upstairs again as Gardner was leaving. He asked Gardner what he wanted done with Karen and Gardner replied, "Kill the bitch." Defendant said, "Okay, brother." Gardner asked if he would need any help; defendant said no, he would get rid of the body where it would not be found. Gardner and Gee left, defendant went upstairs, and Campbell went to sleep downstairs.

Campbell was suddenly awakened by defendant calling his name from upstairs. He responded and found defendant straddling Karen's body with his hands on her throat. Defendant screamed at Campbell to take her pulse. Campbell grabbed the arm of Karen's seemingly lifeless body and found a faint pulse. At the time he told defendant this, he could smell human waste which was all over the bed. Defendant, "hollered", struck the left side of Karen's head, and said, "Die you bitch ... This is a leaky cunt. Die." He continued strangling her, and again screamed at Campbell to take her pulse. Campbell found no pulse. When

Campbell reported this, defendant got off the bed, grabbed Karen's legs, and pulled her off the bed. Defendant took the sheets and blanket to the washing machine and told Campbell to wipe the waste off the floor. Defendant came back and told Campbell to get his truck and put the tailgate down so he could put Karen in it. After Campbell complied, defendant brought the body down and put it in the truck. Campbell and defendant climbed in the truck and Campbell started driving at defendant's direction. Finally defendant had Campbell stop. Defendant got out and dumped the body over a fence into a field. When he returned he told Campbell, "Now, if I'd killed that leaky cunt 17-year-old like I did her ... I wouldn't have been on any rape charges and things I'm on right now." At that time, defendant had a rape charge pending against him filed by a 17-year-old girl. Defendant and Campbell returned to defendant's house where defendant gave Campbell the shotgun to hide, and burned Karen's purse.

Three to four weeks later Campbell and his attorney looked for and found the badly decomposed body of Karen Keeton. They reported this to the authorities. The body was identified by means of her teeth.

## II.

In *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the Court struck down Georgia's death penalty provisions holding that the penalty of death may not be imposed under sentencing procedures that create a substantial risk that the punishment will be inflicted in an arbitrary and capricious manner; the Court did not hold that the infliction of the death *per se* violates the Constitution's ban on cruel and unusual punishments. *Gregg v. Georgia*, 428 U.S. 153, 188, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976).

Following the decision in *Furman v. Georgia, supra,* the Georgia legislature enacted a new death penalty scheme. In *Gregg v. Georgia, supra,* the Court held that this statutory system did not violate the Constitution. The Court stated:

[T]he concerns expressed in *Furman* that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance.

*Id.* at 195, 96 S.Ct. at 2935. The Georgia statute was found to meet this test.

The Missouri death penalty scheme is patterned after the Georgia scheme approved in *Gregg v. Georgia, supra.* Section 565.-008, RSMo 1978, permits the death penalty for only those persons convicted of capital murder.[1] In a capital murder case defendant's guilt or innocence is determined in the first stage of a bifurcated trial. Section 565.006.1, RSMo Supp. 1980. Where the jury or judge returns a guilty verdict, a presentence hearing is held at which,

[T]he jury or judge shall hear additional evidence in extenuation, mitigation, and aggravation of punishment, including the record of any prior criminal convictions and pleas of guilty, or pleas of nolo contendere of the defendant, or the absence of any such prior criminal convictions and pleas. Only such evidence in aggravation as the prosecution has made known to the defendant prior to his trial shall be admissible. The jury or judge shall also hear argument by the defendant or his counsel and the prosecuting attorney regarding the punishment to be imposed.

Section 565.006.2.

The judge is required to consider or to include in his instructions to the jury for it to consider any statutory aggravating or mitigating circumstances supported by the evidence, any mitigating or aggravating circumstances otherwise authorized by law, and,

Whether a sufficient aggravating circumstance or circumstances exist to warrant the imposition of death or whether a sufficient mitigating circumstance or circumstances exist which outweigh the ag-

gravating circumstance or circumstances found to exist.

Section 565.012.1(4), RSMo Supp. 1980.

Unless one of the aggravating circumstances enumerated in § 565.012.2 is found, the death penalty cannot be imposed. Section 565.012.5. If the verdict is a recommendation of death, the jury must designate the aggravating circumstances which it found beyond a reasonable doubt. Section 565.012.4. The judge is required to impose the sentence fixed by the jury. Section 565.006.2.

If the death penalty is imposed, the sentence must be reviewed on the record by this Court. This Court is directed to consider the punishment as well as any errors raised on appeal, and to determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in section 565.012; and

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

Section 565.014.3, RSMo 1978.

The Court must also include in its decision a reference to similar cases taken into consideration. Section 565.014.5. Upon review, the death sentence may be affirmed or set aside and the case remanded for resentencing by the trial judge based on the record and argument of counsel. *Id.*

After the jury found Mercer guilty of capital murder, no additional evidence was presented at the presentence hearing; both the state and defendant did, however, make additional arguments regarding punishment. The court instructed on and the jury found two aggravating circumstances:

1. Whether the defendant, as an agent or employee of Stephen Gardner

1. 565.001. *Capital murder defined.*—Any person who unlawfully, wilfully, knowingly, deliberately, and with premeditation kills or causes

the killing of another human being is guilty of the offense of capital murder.

and at his direction, murdered Karen Keeton. [Section 565.012.2(6)]

2. Whether the murder of Karen Keeton involved depravity of mind and that as a result thereof it was outrageously or wantonly vile and inhuman. [Section 565.012.2(7)]

The court also instructed the jury on the following mitigating circumstances:

1. Whether Karen Keeton was a participant in the defendant's conduct or consented to the act.

2. Whether the defendant acted under extreme duress or substantial domination of another person.

3. The age of the defendant at the time of the offense.

4. . . . [t]he absence of any prior criminal convictions and pleas of guilty or pleas of nolo contendere of the defendant.

### III.

#### A.

Appellant challenges the trial court's excuse for cause of fifteen prospective jurors who expressed conscientious opposition to the imposition of the death penalty. He contends the excuse of five such venire persons violated the constitutional standards of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), because they were excused for voicing general objections to the death penalty. Appellant further contends the court's failure to adhere strictly to the *Witherspoon v. Illinois* standard of qualifying the jury precluded the constitutional application of Missouri's death penalty statutes to prevent the arbitrary and capricious use of jury discretion. In addition, he charges the excuse of the fifteen venire persons violated his constitutional rights to a trial by an impartial jury composed of a cross-section of the community.

In *Witherspoon v. Illinois, supra,* prospective jurors generally opposed to capital punishment had been excluded for cause from the jury that convicted defendant and sentenced him to death. The Court held that:

A sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.

*Id.* at 522, 88 S.Ct. at 1777. The Court noted, however, that its decision did not prevent the execution of a death sentence where veniremen excluded for cause made it "unmistakably clear . . . that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them." *Id.* at 522, n. 21, 88 S.Ct. at 1777, n. 21. *See also Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980); *Davis v. Georgia,* 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 399 (1976); *Maxwell v. Bishop,* 398 U.S. 262, 90 S.Ct. 1578, 26 L.Ed.2d 221 (1970); *Boulden v. Holman,* 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969).

The parties were in agreement and the court understood that a venire person could not be excluded unless that person was, "irrevocably committed to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the trial." The state questioned each juror individually:

If, during the trial of the case the facts and circumstances that come forth as evidence are such that under the law the jury could consider the death penalty, would you, as a juror, consider the death penalty?

The state would follow any negative answer by questioning whether the venire person could assess the death sentence under any circumstance.

The trial court sustained fifteen of the state's challenges for cause on the ground the venire persons were irrevocably committed against imposing the death penalty regardless of the circumstances. Appellant claims for the first time on appeal that five of these fifteen venire persons were equivocal in response to the state's questions. The pertinent examination of the five venire

persons in question is contained in the appendix.

▇ Review of the questions and answers indicates each of the five excused venire persons made it "unmistakably clear" that they would not impose the death penalty under any circumstances. Appellant presents the response of Harry Bumgarner as the most equivocal. His response, "I don't think so," is not equivocal in its context; it is common vernacular to express a negative. *See State v. Pride*, 567 S.W.2d 426, 433 (Mo.App.1978). In light of the trial court' stated understanding of the limited excuse, its ability to observe the tenor of the questioning and the frequent reluctance of lay persons to communicate their deep-seated opinions in a cogent and emphatic manner, it can only be said that the requirements of *Witherspoon v. Illinois, supra*, were met.

Appellant's challenge to the excuse of all fifteen venire persons is actually two-fold. First, he argues that the excuse for cause violated his right under the sixth and fourteenth amendments to trial by a jury drawn from a representative cross-section of the community. Second, he argues the excuse for cause resulted in a jury that was not impartial on the issue of guilt; that it was prosecution-prone. Both of these arguments were rejected in *State v. Mitchell*, 611 S.W.2d 223 (Mo. banc 1981).

▇ As in that case, there is no evidence to establish a prima facie violation of the fair cross-section requirement.[2] If such a prima facie case could be established, the state has a significant interest in impaneling only those jurors who have stated that they can follow the law. The exclusion of those venire persons who have stated unambiguously that they cannot, under any circumstances, consider a certain punishment permissible under the law does not violate representative cross-section requirements of the sixth and fourteenth amendments. *Spenkellink v. Wainwright*, 578 F.2d 582, 597 (5th Cir. 1978), *cert. denied*, 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979). The right to a representative jury does not include the right to be tried by jurors who have explicitly indicated an inability to follow the law. *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

In *Witherspoon v. Illinois, supra*, 391 U.S. at 516, 88 S.Ct. at 1774, petitioners maintained that a jury selected in the manner present in that case, must necessarily be biased in favor of conviction citing two surveys in support. *See Witherspoon v. Illinois, supra* at 517, n. 10, 88 S.Ct. at 1774, n. 10. The Court found that the data presented was "too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt," and declined to conclude that the "exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction." *Id.* at 517–518, 88 S.Ct. at 1774–1775. The Court refused to reverse the conviction. *See also Bumpers v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).

Following *Witherspoon v. Illinois, supra*, a number of studies were published on a theory that "death-qualified" jurors are not impartial on the issue of guilt.[3] These stu-

2. The three elements that establish a prima facie violation are: (1) the persons excluded from jury service must be members of a " 'distinctive' group in the community"; (2) the representation of this group in venires is "not fair and reasonable in relation to the number of such persons in the community"; and (3) the underrepresentation is due to a "systematic exclusion of the group in the jury-selection process." *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979).

3. Defendant cites the following: V. Boehm, *Mr. Prejudice, Miss Sympathy, and the Authoritarian Personality; An Application of Psychological Measuring Techniques to the Problem of Jury Bias*, 1968 Wisc.L.Rev. 734; E. Bronson, *On the Conviction-Proneness and Representativeness of the Death-Qualified Jury: An Empirical Study of Colorado Veniremen*, 42 U.Colo.L.Rev. 1 (1970); F. Goldberg, *Toward Expansion of Witherspoon: Capital Scruples, Jury Bias, and Use of Psychological Data to Raise Presumptions in the Law*, 5 Harv. Civil Rights—Civil Liberties L. Rev. 53 (1970); E. Jurow, *New Data on the Effect of a "Death*

dies, however, are not conclusive, and this Court will not reverse defendant's conviction on the basis of the studies presented.

■ Those chosen to be jurors in no way indicated that they were biased for the prosecution or against the defendant; they indicated only that they would consider the death penalty if the law and facts permitted it. As stated in *Spenkellink v. Wainwright, supra* at 594:

> [T]he veniremen indicated only that they would be willing to perform their civic obligation as jurors and obey the law. Such persons cannot accurately be branded prosecution-prone.

■ "A juror wholly unable to ever consider the death penalty no matter what the facts of a given case, would clearly be unable to follow the law ... in assessing punishment." *Adams v. Texas, supra* at 2526. The state has a legitimate interest in administering its death penalty statute which permits it to bar from jury service those whose belief about capital punishment would lead them to ignore the law. *Adams v. Texas, supra. See also State v. Mitchell, supra.*

### B.

In the state's opening statement the prosecuting attorney told the jury:

> We are back at the location where Karen Keeton's body was dumped, and Mercer says to Campbell: 'I wouldn't be in the trouble I'm in today if I'd killed that other bitch on the rape.'

> \* \* \* \* \* \*

> 'I was going to do it, but Bruce Miller talked me out of it.'

> Deborah Middleton will come here and testify. Deborah Middleton will tell you that she first met George Mercer on July 26th, 1978, and that basically an occurrence happened in which she later brought charges against George Mercer

and before August 31st of 1978. She'll be here to testify.

Defendant objected and requested a mistrial which was denied. John Campbell later in the trial testified that after defendant had dumped the body:

> He got in the truck, and he said, 'Now, if I'd killed that leaky cunt 17-year-old like I did her,' he says, 'I wouldnt've been on any rape charges and things I'm on right now.'

Defendant objected to the calling of Deborah Middleton to testify about the rape charge she brought against defendant. The trial court ruled that Middleton could testify that she had made an accusation of rape against defendant prior to August 31, 1978 (the day of Karen Keeton's murder), provided the state did not go into the truth of the charge. Defendant then agreed to stipulate that:

> On July 26, 1978, a 17-year-old female accused the defendant, George Mercer, of rape, and as a result of that accusation a criminal prosecution for rape was commenced against the defendant, George Mercer, prior to August 31, 1978.

Appellant now charges error to permitting the prosecutor to state in opening statement that Deborah Middleton would testify about her rape charge against the defendant, and argues he was forced to choose between having Deborah Middleton testify or entering into the stipulation. Appellant contends Deborah Middleton's testimony was inadmissible and therefore the stipulation and reference in opening statement were improper because there was no evidence that the person defendant referred to in his statement to John Campbell was Deborah Middleton, because the stipulation defendant was forced into agreeing to constituted proof of a separate and distinct crime for which defendant was not on trial, and because it constituted an attack upon

*Qualified Jury" on the Guilt Determination Process*, 84 Harv.L.Rev. 567 (1971); M. Rokeach & D. McLellan, *Dogmatism and the Death Penalty: A Reinterpretation of the Duquesne Poll Data*, 8 Duquesne L.Rev. 125 (1969–70); W. White, *The Constitutional Invalidity of Con-*

*victions Imposed by Death-Qualified Juries*, 58 Cornell L.Rev. 1176 (1973) (reporting 1971 Harris Poll data); H. Zeisel, *Some Data on Juror Attitudes Toward Capital Punishment* (1968) published by the Center for Studies in Criminal Justice, University of Chicago Law School.

defendant's character which had not been placed in issue.

■ In view of John Campbell's testimony concerning the defendant's statement after dumping Karen Keeton's body, Deborah Middleton's testimony, limited to the bringing of a rape charge against defendant prior to August 31, 1978, would have been admissible. Therefore the trial court did not err in permitting the prosecuting attorney to refer to this in his opening statement or in permitting the stipulation in lieu of her testimony.

Defendant denied the killing and sought to portray John Campbell as a liar. It was necessary for the state to establish defendant's motive, and to corroborate John Campbell's testimony. Defendant's statement to John Campbell was relevant as evidence of his motive in killing Karen Keeton; he killed her to avoid detection of the rape. Deborah Middleton's testimony would have explained defendant's statement and would have corroborated John Campbell's testimony—the state sought to prove that there was in fact a 17-year-old girl who had brought rape charges against defendant prior to the murder of Karen Keeton. The stipulation did not go into the facts leading to the charges or the disposition of those charges.

■ The admissibility of the stipulation is not affected by the lack of direct evidence establishing that Deborah Middleton was the girl referred to by defendant in his statement to John Campbell. Evidence need only be relevant, not conclusive. It is relevant if it logically tends to prove a fact in issue or corroborates relevant evidence which bears on the principal issue. *State v. Lee*, 556 S.W.2d 25 (Mo. banc 1977), *vacated on other grounds*, 439 U.S. 461, 99 S.Ct. 710, 58 L.Ed.2d 736 (1979). Nor is this otherwise relevant evidence on the issue of motive rendered inadmissible because it might also tend to constitute proof of another crime or discredit defendant's character. *See State v. Holt*, 592 S.W.2d 759, 775 (Mo. banc 1980); *State v. Richardson*, 515 S.W.2d 571, 573 (Mo. 1974).

## C.

Prior to trial the court sustained defendant's motion to suppress a mattress cover seized during a warrantless search of defendant's residence. During cross-examination of defendant, the state asked:

You were aware that in the upstairs bedroom of that house that there was a mattress that was covered with human feces—

Defendant objected and requested a mistrial on the ground his motion to suppress the feces covered mattress had been sustained by the trial court. The court overruled the objection and motion for mistrial noting that there was evidence independent of any search and seizure that would authorize the question. Appellant now charges error to the trial court for overruling the objection and motion. He argues that this statement was "clearly calculated to inflame the passion of the jury against the defendant by mentioning matters of an inherently abhorrent nature."

■ Evidence obtained by an illegal search and seizure is not admissible against the defendant in a criminal case. If, however, the state gains the same knowledge or evidence from an independent source it may become admissible. *State v. Wilkerson*, 349 Mo. 205, 159 S.W.2d 794, 798 (1942).

■ There is evidence independent of the suppressed mattress cover to support the cross-examination of the defendant on this matter. John Campbell had previously testified that at the time of the murder he could

smell the human waste. It was all over the sheets, and the sheets and her kind of came off of the bed the same time he pulled her . . . .

* * * * * *

Q. Could you see anything on the bed?
A. You could see the human waste, yes.

The state's question was not designed to inflame the jury. Defendant had taken the stand and denied strangling Karen Keeton. On cross-examination the state attempted

and was successful in getting defendant to admit that he had given an excuse to someone for the feces on the bed, thereby acknowledging its presence and corroborating John Campbell's testimony. The court properly permitted the state's question.

## IV.

Section 565.014.1, requires this Court to review a sentence of death when imposed. Section 565.014.3 provides:

With regard to the sentence, the supreme court shall determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in section 565.012; and

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

The record in this case demonstrates that George Mercer's death sentence was not imposed under the influence of passion, prejudice or any other arbitrary factor.

■ The jury found as statutory aggravating circumstances that the "defendant, as an agent or employee of Stephen Gardner and at his direction, murdered Karen Keeton", § 565.012.2(6), and that the murder of Karen Keeton involved depravity of mind and that as a result thereof it was outrageously or wantonly vile and inhuman, § 565.012.2(7).[4] The evidence supports the jury's findings.[5]

Defendant forced Karen Keeton, a total stranger, into a bedroom aided by a sawed-off shotgun. There is evidence to show that he had sex with Karen, and that he

---

4. This subsection provides:

(7) The offense was outrageously or wantonly vile, horrible or inhuman in that it involved torture, or depravity of mind;

In *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the petitioner attacked the Georgia aggravating circumstance which authorized imposition of the death penalty if the murder was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim" contending that it was so broad that capital punishment could be imposed in any such case. The Court denied the challenge stating:

It is, of course, arguable that any murder involves depravity of mind or an aggravated battery. But this language need not be construed in this way, and there is no reason to assume that the Supreme Court of Georgia will adopt such an open-ended construction. *Id.* at 201, 96 S.Ct. at 2938.

Thereafter the Georgia Supreme Court recognized that "there is a possibility of abuse of [this] statutory aggravating circumstance" and emphasized that it would not permit the aggravating circumstance to become a "catch all" for cases not fitting within any other aggravating circumstance; the court stated it would restrict its "approval of the death penalty under this statutory aggravating circumstance to those cases that lie at the core." *Harris v. State*, 237 Ga. 718, 732–33, 230 S.E.2d 1, 10–11 (1976) *cert. denied*, 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 251 (1977). Likewise, it is the intention of this Court to restrict application of § 565.012.2(7) to "cases that lie at the core" and to not permit it to become a "catch all" subsection.

5. Although the evidence supports the jury's findings on both aggravating circumstances, this Court notes that in Georgia, whose death penalty scheme serves as the pattern for Missouri,

Where two or more statutory aggravating circumstances are found by the jury, the failure of one circumstance * * * does not taint the proceedings so as to invalidate the other aggravating circumstance found and the sentence of death based thereon.

*Burger v. State*, 245 Ga. 458, 265 S.E.2d 796, 800 (1980), *cert. denied*, 446 U.S. 988, 100 S.Ct. 2975, 64 L.Ed.2d 847 (1980). *See also Hamilton v. State*, 246 Ga. 264, 271 S.E.2d 173 (1980), *cert. denied*, —— U.S. ——, 101 S.Ct. 900, 66 L.Ed.2d 829 (1981); *Brooks v. State*, 246 Ga. 262, 271 S.E.2d 172 (1980); *Collins v. State*, 246 Ga. 261, 271 S.E.2d 352 (1980), *cert. denied*, —— U.S. ——, 101 S.Ct. 900, 66 L.Ed.2d 829 (1981); *Gates v. State*, 244 Ga. 587, 261 S.E.2d 349 (1979), *cert. denied*, 445 U.S. 938, 100 S.Ct. 1332, 63 L.Ed.2d 772 (1980). *But see Elledge v. State*, 346 So.2d 998 (Fla.1977); *Menendez v. State*, 368 So.2d 1278 (Fla.1979); *Bufford v. State*, 382 So.2d 1162 (Ala.App. 1980), *cert. denied*, 382 So.2d 1175 (Ala.1980); *State v. Cherry*, 298 N.C. 86, 257 S.E.2d 551 (1979), *cert. denied*, 446 U.S. 941, 100 S.Ct. 2165, 64 L.Ed.2d 796 (1980); *Stephens v. Zant*, 631 F.2d 397 (5th Cir. 1980).

stated his intention to return for more. He compelled her at gunpoint to perform oral sex on David Gee while others watched. She expressed fear for her well-being to David Gee and John Campbell. When Steve Gardner told defendant to "kill the bitch", he agreed to do so. He grabbed her about the throat, choking her; he struck her with his fists; finally, after having a friend check her pulse, he succeeded in strangling her. After this he loaded the body in a truck, drove to the country, and dumped the body beneath a bridge.

█ In *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), the Court held that the Georgia Supreme Court had failed to apply a constitutional construction of the phrase "outrageously or wantonly vile, horrible or inhuman in that [they] involved ... depravity of mind ....," because the defendants crimes could not

> be said to have reflected a consciousness materially more 'depraved' than that of any person guilty of murder. His victims were killed instantaneously. They were members of his family who were causing him extreme emotional trauma. Shortly after the killings, he acknowledged his responsibility and the heinous nature of his crimes.

*Id.* 100 S.Ct. at 1767. This case is unlike *Godfrey v. Georgia, supra.* "Depravity of mind" is demonstrated in this case by the mode of killing preceded by extended sexual and psychological abuse of the victim. *See Hance v. State*, 245 Ga. 856, 268 S.E.2d 339, 345–46 (1980), *cert. denied,* —— U.S. ——, 101 S.Ct. 958, 67 L.Ed.2d 122 (1980).

The enumerated legal errors have been denied for the reasons stated, and the statement of evidence prepared from the record factually substantiates the verdict. Section 565.014.7. The evidence also supports the finding of the aggravating circumstances and the sentence of death by a rational trier of fact beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

█ This is the first capital murder case decided on appeal in which the death penalty was imposed under the law effective May 26, 1977. The records of all capital cases in which sentence was imposed after the effective date, accumulated pursuant to § 565.014.6, have been reviewed. Those cases in which both death and life imprisonment were submitted to the jury, and which have been affirmed on appeal are considered as similar cases, § 565.014.5: *State v. Mitchell*, 611 S.W.2d 223 (Mo. banc 1981); *State v. Williams*, 611 S.W.2d 26 (Mo. banc 1981); *State v. Royal*, 610 S.W.2d 946 (Mo. banc 1981); *State v. Borden*, 605 S.W.2d 88 (Mo. banc 1980); and *State v. Downs*, 593 S.W.2d 535 (Mo.1980). These cases support affirmance of the death penalty in this case; defendant's sentence to death for the murder of Karen Keeton is not excessive or disproportionate to the penalty imposed in similar cases considering the crime and the defendant.

The judgment is affirmed.

DONNELLY, RENDLEN, WELLIVER and MORGAN, JJ., concur.

BARDGETT, C. J., concurs in part and dissents in part in separate opinion filed.

SEILER, J., dissents in separate dissenting opinion filed.

Date of execution set for June 26, 1981.

## APPENDIX

Harry Bumgarner:

"EXAMINATION BY MR. HAMILTON (Prosecutor):

Q. Mr. Bumgarner, this is a charge of capital murder, which means that it does carry the possibility of capital punishment, or the death sentence. My inquiry is directed to find out what your attitude is toward capital punishment. If, during the trial of this case the facts and circumstances were developed that in fact the jury could consider capital punishment, would you, as a juror, consider capital punishment as a possible alternative?

A. I don't think so.

Q. Are you morally and religiously opposed to capital punishment?

A. Yes.

Q. And you feel you couldn't bring back a sentence of—the death sentence under any circumstances?

A. I don't think so.

Q. So regardless of how severe and aggravated the circumstances are, you don't feel that you could bring back a death penalty?

A. I don't believe I could."

Rosalie M. Delange:

"EXAMINATION BY MR. HAMILTON (Prosecutor):

Q. Mrs. Delange, this is a charge of capital murder, which carries with it the possibility of capital punishment, which is the death penalty.

\* \* \* \* \* \*

Q. Basically I am interested in your attitude as to the death penalty, and my question is: If the facts and circumstances which come out during the course of this trial are such that the jury, under the law, can consider as a possible alternative, capital punishment—

\* \* \* \* \* \*

Q. —would you, as a member of that jury, give consideration to that as a possibility?

A. I am opposed to capital punishment.

Q. Okay, then are you basically morally and religiously against capital punishment as a punishment?

A. I would say that.

Q. Are you such that basically, regardless of what the circumstances are, you are against capital punishment?

A. I have always thought of myself as being against capital punishment. I don't really know, when you put it that way, maybe circumstances could alter my decision, but I really think I would have to say I'm against it.

Q. Am I correct in saying that basically you wouldn't vote for capital punishment regardless?

A. I think, right, I would have to say that.

Q. No matter how violent the crime might be, you would be against that as punishment, am I correct?

A. I just don't believe in taking a life. I just don't. I'm sorry.

\* \* \* \* \* \*

Q. (By Mr. Lozano—Defense Counsel): —if—can you say that you would never consider capital punishment under any circumstances whatsoever?

A. I will say that."

Elston Dalton:

"EXAMINATION BY MR. HAMILTON (Prosecutor):

Q. Mr. Dalton, this is a charge of capital murder, which carries a possibility of capital punishment—

\* \* \* \* \* \*

Q. —the death penalty. And my question is about your attitude as to the death penalty. If the facts and circumstances in this trial are such that under the law the jury can consider as an alternative the death penalty, would you, as a member of that jury, be willing to consider that as a possible alternative?

A. Well, I never did much like that subject.

Q. Let me ask you the, sir, are you telling us that basically you would be unwilling to return a death penalty verdict?

A. I believe I would sir.

Q. Would you be willing to, or be unwilling to, return such a verdict regardless of what the evidence is?

A. I didn't understand you.

Q. Are you saying, sir, that you wouldn't return a result of death, a death penalty result, regardless of what the evidence is?

A. Well, as I said, I don't believe in the death penalty.

Q. Basically the opposition is such that you wouldn't return it under any circumstances, is that correct?

A. Yeah, that's the way I feel about it."

Juanita Bishop:

"EXAMINATION BY MR. HAMILTON (Prosecutor):

Q. Mrs. Bishop, this is a charge of capital murder, and it carries with it the potential of the death penalty, the death sentence. Basically I am interested in your attitude as to capital punishment.

If the facts and circumstances brought out during the trial are such that they justify it, justify the death penalty, would you consider giving the death penalty?

A. (Pause) I don't think so.

Q. Do you feel that your inclination is that morally and religiously you don't feel you could bring back a sentence of death in any case?

A. Yes, I don't feel like I'd be a judge of it.

Q. You don't feel you could ever bring back the death penalty regardless of the situation, is that correct?

A. Yes.

\* \* \* \* \* \*

Q. (By Mr. Lozano—Defense Counsel) Yes. Is your position that you could never vote for capital punishment in any case at any time no matter what the facts?

A. I'd say it is."

Priscilla Choate:

"EXAMINATION BY MR. HAMILTON (Prosecutor):

Q. Mrs. Choate, this is a charge of capital murder, and it carries with it the possibility of the death sentence, or of capital punishment.

\* \* \* \* \* \*

Q. Basically I am interested in inquiring of you as to what your attitude is toward capital punishment, and my question is: If, during the trial of the case the facts and circumstances that come forth as evidence are such that under the law the jury could consider the death penalty, would you, as a juror, consider the death penalty?

A. I don't believe in capital punishment.

Q. Are you opposed to capital punishment?

A. Yes, I am.

Q. Are you religiously and morally opposed to it?

A. Well, I don't know, its just my opinion. It's not really from religion or anything like that.

Q. But it's such that you feel that you would not bring back the death penalty under any circumstances?

A. I don't think I would.

Q. So, regardless of how severe or aggravated the situation is, it's your feelings that you could not impose the death sentence?

A. I don't think so.

\* \* \* \* \* \*

THE COURT: Ma'am, you say you don't think so. We need to be a little more precise.

MRS. CHOATE: Well, I couldn't, no. That's just my own personal feelings; I just couldn't do it.

\* \* \* \* \* \*

Q. (Examination by Mr. Fiorella—Defense Counsel) .... Would you rule that out [death penalty] because of your feelings?

A. You mean corporal punishment?

Q. Yes.

A. Yeah, I believe I would. I just can't go along with it.

BARDGETT, Chief Justice, concurring in part and dissenting in part.

I concur in the affirmance of the judgment of conviction of capital murder. I dissent from the affirmance of the death penalty on the record here and would, for the reasons stated infra, vacate this death penalty but allow the state to again proceed to obtain the death penalty from a jury upon the state's notifying this Court within 30 days of its decision to do so. If the state failed to so notify this Court of its intent to seek the death penalty anew, the sentence of life imprisonment without parole for 50 years should be imposed.

The proceedings in a capital murder case are bifurcated and error which affects only the punishment aspect of this crime warrants a new trial only as to punishment, as provided in § 565.006.3 RSMo 1977.

The evidentiary facts have been amply stated and clearly support a verdict of guilty of capital murder. But, when the punishment is death, then I believe strict compliance with constitutional requirements and those statutes authorizing the death penalty is mandatory. Death penalty cases are different from other cases for that simple reason—death. It is not correctable, as are other sentences, and therefore strict adherence to procedure is necessary. The fact that the defendant showed no mercy to the deceased and appears to have committed just about as evil an act as one could do does not justify law-abiding citizens—jurors, judges and lawyers—from straying from strictly correct proceedings as we go about the task of deciding whether to legally kill him.

I agree with part I of Judge Seiler's dissent reference the response to juror Bumgarner to questions relating to his ability to consider the death penalty. For the reasons stated there the juror's answers did not justify his removal for cause under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). That error goes to the death penalty only and therefore, under the bifurcated system, did not prejudice the guilt part of the trial but did prejudice the punishment aspect of the case for the reasons stated in *Witherspoon, supra.*

Part IV of the principal opinion and part III of the dissent of Seiler, J., addresses the issue of the statutory aggravating circumstances. It appears to me that the principal opinion holds that there was sufficient evidence to find that the "defendant, as an agent or employee of Stephen Gardner and at his direction, murdered Karen Keeton," § 565.012.2(6). However, it also appears that perhaps the principal opinion inferentially adopts the rule in Georgia as set forth in footnote 5, which may mean that the death penalty is to be upheld regardless of whether the "aggravating circumstance" noted, supra, was supported by the evidence and perhaps regardless of whether the circumstance can, under the evidence here, be rationally regarded as "aggravating."

In my opinion, the evidence fails to support a finding that defendant was "an agent or employee of Stephen Gardner." There is no evidence he was an employee of Gardner. There is no evidence, in my opinion, that the defendant killed the deceased because Gardner told him to. In fact, the state's position is that he killed her to keep her from prosecuting him for rape as the other girl had done.

I have tried to perceive just how a murder such as this is worsened or the defendant a more heinous person if he killed the deceased as an agent or employee of another. I have no difficulty in understanding aggravating circumstance # 4 which provides for a killing for profit for himself or another and the first part of # 6 which provides that the "offender caused or directed another to commit capital murder." Number 4 recalls to mind Murder Incorporated of yesteryear and the first part of # 6 recognizes that if a person causes or directs another to commit capital murder, the director is surely at least as guilty as the actor. But I cannot see what the rationale is when the actor is the employee or agent. How does it make the act more heinous or the defendant more evil if the defendant is being directed by another as the employee or agent of another? I am not saying the circumstance submitted here, as to the actor, could never be an "aggravating circumstance" but under the facts of this case I do not see any rational basis here for saying the verbal exchange between defendant and Gardner made defendant's acts more aggravated or heinous. In my opinion, the evidence was insufficient to support the giving of aggravating circumstance # 6.

Furthermore, I would not adopt the Georgia rule noted in footnote 5 of the principal opinion. In my opinion, there must be evidence to support the submission of each statutory aggravating circumstance found

by the jury and upon which the death penalty was based, in whole or in part, and the statutory circumstances must be ones that can rationally be perceived as aggravating in the particular case. Circumstance # 6 should not, in my opinion, have been submitted here because it fails on both counts in this case.

I agree with the rule requiring evidence to support each aggravating circumstance submitted as set forth in the dissent of Seiler, J., and if the evidence is insufficient to support an aggravating circumstance upon which the jury based the death penalty, in whole or in part, the death penalty cannot stand.

I would therefore (1) affirm the judgment of capital murder, (2) vacate the death penalty and order that the sentence will be entered as life imprisonment without parole for 50 years (565.008) unless the state, within 30 days of this decision, notifies the Clerk of this Court that it intends to proceed with a new trial on punishment pursuant to § 565.006.3, whereupon the cause would be remanded to circuit court for a new trial on punishment only.

SEILER, Judge, dissenting.

I respectfully dissent and for reasons stated below, I would reverse and remand this cause.

I

I cannot agree with the principal opinion's treatment of appellant's objection to the striking for cause of venireman Bumgarner under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The principal opinion found that Bumgarner had made it "unmistakably clear" that he would not impose the death penalty under any circumstance. In *Witherspoon, supra* at 516 n. 9, 88 S.Ct. at 1774 n. 9, the Court required that

Unless an venireman states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, it simply cannot be assumed that that is his position."

This requirement has been reiterated by the Court in *Boulden v. Holman*, 394 U.S. 478, 482, 89 S.Ct. 1138, 1140, 22 L.Ed.2d 433 (1969) and in *Maxwell v. Bishop*, 398 U.S. 262, 265, 90 S.Ct. 1578, 1580, 26 L.Ed.2d 221 (1970).

In *Davis v. Georgia*, 429 U.S. 122, 123, 97, S.Ct. 399, 400, 50 L.Ed.2d 399 (1976), the Court held that

"if [one] venireman is improperly excluded [under the *Witherspoon* standard] any subsequently imposed death penalty cannot stand."

The *Davis* court cited *Wigglesworth v. Ohio*, 403 U.S. 947, 91 S.Ct. 2284, 29 L.Ed.2d 857 (1971) *rev'g State v. Wigglesworth*, 18 Ohio St.2d 171, 248 N.E.2d 607 (1969). In that case the United States Supreme Court apparently disapproved of the Ohio Supreme Court's conclusion that,

"Even if defendant could claim that the excusing of this one juror for cause was error, we have difficulty in seeing how any prejudice therefrom can be established, especially since the prosecution still had five or six peremptory challenges available to excuse that juror when selection of the jury was completed."

248 N.E.2d at 614. If Bumgarner was improperly dismissed, as I contend he was, then the death penalty must be reversed.

The question and answers between the prosecuting attorney and venireman Bumgarner are set forth below. This exchange does not provide a constitutional basis for the exclusion for cause of Bumgarner from jury service.

"Q. Mr. Bumgarner, this is a charge of capital murder, which means that it does carry the possibility of capital punishment, or the death sentence. My inquiry is directed to find out what your attitude is toward capital punishment. If, during the trial of this case the facts and circumstances were developed that in fact the jury could consider capital punishment, would you, as a juror, consider capital punishment as a possible alternative?

A. I don't think so.

Q. Are you morally and religiously opposed to capital punishment?

A. Yes.

Q. And you feel you couldn't bring back a sentence of—the death sentence under any circumstances?

A. I don't think so.

Q. So regardless of how severe and aggravated the circumstances are, you don't feel that you could bring back a death penalty?

A. I don't believe I could.

MR. HAMILTON: Thank you, sir. I have no other questions."

The principal opinion relies on *State v. Pride*, 567 S.W.2d 426, 433 (Mo.App.1978) for the proposition that the response "I don't think so" is not equivocal in its context; rather, that it is "common vernacular to express the negative." I would first point out that *Pride* was not a capital murder case in which the death penalty could be imposed. *Pride* was an assault case, where defendant was a black man. The wife of one of the veniremen had had "an unpleasant encounter with blacks in the past." When asked if that would affect him in sitting in the case, the venireman replied, "I don't really think so, but I thought I would mention it." This disclaimer is more emphatic than that in the case before us. Second, while I would agree that when someone says "I don't think so" he may intend to express the negative, he may also mean that he is not sure. At best, it is equivocal, ambiguous, and uncertain. Bumgarner did not say that he would not be able to decide the issues on the basis of the law and evidence even though opposed generally to capital punishment. We are talking about taking defendant's life by judicial order. In such circumstances, it is not the proper duty or function of the trial court or this court to "interpret" such a phrase by resolving the doubt in favor of the state when a man's life is at stake and the United States Supreme Court has declared that "Unless a venireman states *unambiguously* that he would automatically vote against the imposition of capital punishment ... it simply cannot be *assumed* that that is his position." (emphasis supplied)

391 U.S. at 516 n. 9, 88 S.Ct. at 1774.

Bumgarner's view on the subject was left hanging in the air, unresolved. The *Witherspoon* test was not satisfied as to Bumgarner. If the prosecutor does not get an unequivocal response, then he is not entitled to have the venireman dismissed for cause. Cf. *Adams v. Texas*, 448 U.S. 38, 50, 100 S.Ct. 2521, 2528–29, 65 L.Ed.2d 581 (1980) in which the Supreme Court said:

"[N]either nervousness, emotional involvement, nor *inability to deny or confirm* any effect whatsoever [that being presented with the option to give death penalty would have on the prospective juror] is equivalent to an unwillingness or an inability on the part of the jurors to follow the court's instructions and obey their oaths, regardless of their feelings about the death penalty." (emphasis supplied).

II

On the issue of sustaining fifteen challenges for cause on the ground that the venire persons were irrevocably committed against imposing the death penalty regardless of the circumstances, the principal opinion holds it will not reverse the conviction on the basis of studies indicating that "death qualified" jurors are not impartial on the issue of guilt. In addition to the studies cited by defendant and the studies cited in *Hovey v. Superior Court of Alameda County*, 28 Cal.3d 1, 616 P.2d 1301, 168 Cal.Rptr. 128 (banc 1980) and *Grigsby v. Mabry*, 483 F.Supp. 1372 (E.D.Ark.), aff'd, 637 F.2d 525 (8th cir. 1980), there should be added White, Death-Qualified Juries: The Prosecution-Proneness Argument Reexamined, 41 U.Pitt.L.Rev. 353 (1980) and Ober, Does Disqualification of Jurors for Scruples Against Capital Punishment Constitute Denial of Fair Trial on Issue of Guilt?, 39 Tex.L.Rev. 545 (1961). The latter author states the defendant's predicament well: "Were I to be charged with a capital of-

fense, I should greatly prefer to have the issue of my *guilt or innocence* tried by the first twelve people to pass the courthouse, no questions asked by prosecution *or* defense, than by a jury qualified upon the death sentence." *Oberer, supra* at 545. (original emphasis). White, *supra* at 406, states: "If, as the Supreme Court has indicated, the conclusion that death is a punishment different in kind from all other punishments has committed our society to the ideal of providing fair and rational procedures which will fully safeguard the rights of capital defendants, then examination of the relevant data should lead to the conclusion that the death qualified jury, as it presently exists, should be eliminated from our system of justice."

Under the Missouri Constitution, Art. I, § 18(a), defendant is entitled to trial by an impartial jury. This is an absolute right. There are no qualification or exceptions to it. The state is not entitled to the death penalty against this defendant as a matter of right. All it is entitled to is a jury which will consider the death penalty, assuming guilt has been determined. I do not believe challenges for cause at the outset of the trial are valid unless the prospective juror declares that his views on capital punishment are such as would prevent him from making an impartial decision as to defendant's guilt. It does not follow that persons opposed to the death penalty are necessarily thereby unable to make an impartial decision as to defendant's guilt. But that was never determined here—the prospective jurors were excluded simply because they would not vote for the death penalty. So defendant wound up with a jury which had no scruples against the death penalty, which is a far cry from having a jury with some members who oppose the death penalty but could nevertheless make an impartial decision as to guilt. This error in excluding prospective jurors who were not shown to be incapable of making an impartial decision as to guilt or innocence requires that the cause be reversed and remanded.

The studies mentioned earlier about death qualified juries being less than neutral with respect to guilt confirm what lawyers with broad trial experience already believe: it is easier to obtain a conviction of some sort with a jury which has no objections to the death penalty,[1] just as it is easier to obtain a verdict in some amount for the plaintiff in a damage suit with a jury made up only of those who have no objection to awarding large amounts of damages.

Our present procedure permits prosecutors, merely by filing a capital murder charge, to obtain a death qualified, conviction prone jury, even though they promptly waive the death penalty upon conviction of guilt.[2] This powerful incentive to overcharge would be eliminated if we restrict voir dire examination along the lines here suggested. It also would provide a more impartial jury.

### III

I further disagree with the principal opinion's holding that the evidence supported the jury's finding of both aggravating circumstances. I do not believe that there was sufficient evidence to support the jury's finding of the first aggravating circumstance—that defendant killed the victim as the "agent or employee" of Gardner.

Section 565.012.3(6), RSMo 1978[3] lists as an aggravating circumstance that "The offender . . . committed capital murder as an agent or employee of another person." Since there is no evidence that defendant was an employee of Gardner, we must as-

---

1. One 1968 study concluded that the odds were twenty-four to one that jurors without scruples against the death penalty were more likely than the scrupled jurors to vote guilty. H. Zeisel, Some Data on Juror Attitudes Towards Capital Punishment 28–29 (1968).

2. For example, in *State v. Strickland*, 609 S.W.2d 392 (Mo. banc 1980) and *State v. Hall*, 612 S.W.2d 782 (Mo., 1981), both from Jackson County, the prosecutor in each case after filing a capital murder charge and obtaining a death qualified jury, waived the death penalty immediately *after* obtaining a guilty verdict on the guilt or innocence stage of the trial.

3. Unless otherwise indicated, all statutory citations are to RSMo 1978.

sume that the jury found defendant was an agent of Gardner. Black's Law Dictionary 59 (5th ed. 1979) defines an agent as "A person authorized by another to act for him, one intrusted with another's business." *See State ex rel. Pagliara v. Stussie*, 549 S.W.2d 900, 903 (Mo.App.1977). Black's, *supra*, also defines an agent as "One who acts for or in place of another by authority from him; a substitute, a deputy, appointed by principal with power to do the things which principal may do." *Cf. Mahler v. Tieman*, 550 S.W.2d 623, 628 (Mo.App.1977): "A valid agency may be found where the conduct of the parties manifests the consent of one person to another that the other shall act on his behalf and be subject to his control and consent by the other so to act." *See also* Restatement (Second) of Agency § 1 (1958).

The part of § 565.012.3(6) directed against one who commits capital murder as the agent or employee of another is meant for someone who fits the accepted concept of agent or employee. There is no evidence that such was the situation here. The only evidence upon which the jury could have based its finding that defendant was an agent of Gardner was that defendant asked Gardner what to do with Karen Keeton and Gardner replied, "Kill the bitch." There is no evidence to demonstrate that Gardner had authority or control over defendant. The fact that Gardner said to defendant, "Kill the bitch", followed by defendant's strangling of the victim, does not establish a cause and effect relationship. It does no more than show that the two were in accord. Without further evidence of an agency relationship between Gardner and defendant, the first aggravating circumstance cannot be upheld.

The statute, § 565.012.1(1), and the appropriate MAI—CR2d instruction, 15.48, require that only those aggravating circumstances supported by the evidence be submitted for the jury to consider. It would be most unfair and prejudicial to permit the state to submit and argue to the jury aggravating circumstances not supported by the evidence.[4] The legislature and this court properly required that aggravating circumstances which the jury is to consider in determining whether the death penalty is warranted be supported by evidence.

If the finding of the first aggravating circumstance is unsupported under the evidence, as I contend it is, then the sentence of death cannot stand. When one or more aggravating circumstances have been improperly submitted to, or found by, the jury (or the trial court), then, even if other aggravating circumstances were legitimately found, the case must be remanded for sentencing, § 565.014.5(2). The reason for this is simple: "[R]egardless of the existence of other authorized aggravating factors we must guard against any unauthorized aggravating factor going into the equation which might tip the scales of the weighing process in favor of death." *Elledge v. State*, 346 So.2d 998, 1003 (Fla.1977); *See also Menendez v. State*, 368 So.2d 1278, 1282 (Fla.1979). There is no way to determine what the jury would have decided as to penalty had they not improperly been allowed to consider as an aggravating circumstance that defendant was acting as Gardner's agent. The jury may have felt free to tar defendant with Gardner's reprehensible conduct in addition to his own. For other cases in which the courts have decided that failure of one or more aggravating circumstances was cause for reversal of the death sentence, *see Bufford v. State*, 382 So.2d 1162 (Ala.Ct.Crim.App.1980), *cert. den.*, 382 So.2d 1175 (Ala.1980); *State v. Cherry*, 298 N.C. 86, 257 S.E.2d 551 (1979), *cert. den.*, 446 U.S. 941, 100 S.Ct. 2165, 64 L.Ed.2d 796 (1980). *See also Stephens v. Zant*, 631 F.2d 397, 406 (5th Cir. 1980) in which the court observed:

"It is impossible for a reviewing court to determine satisfactorily that the ver-

4. The prosecutor, in arguing to the jury for the death penalty, said that Gardner told defendant to kill the victim, that defendant readily went along with this, and that the jury should "[r]emember that as an important piece of evi-

dence." So the jury was urged to consider the "agent or employee" aggravating circumstance as a justification for the death penalty. How can it be said they did not do so?

dict in this case was not decisively affected by an unconstitutional statutory aggravating circumstance. The jury had the authority to return a life sentence even it it found statutory aggravating circumstances. It is possible that even if the jurors believed that other aggravating circumstances were established, they would not have recommended the death penalty but for the [considering of the invalid aggravating circumstance]."

The court held that the submission of an impermissible aggravating circumstance to the jury did not permit the jury's discretion to be sufficiently channeled, citing *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), and that the process by which the death penalty was imposed was therefore not "rationally reviewable", citing *Woodson v. North Carolina*, 428 U.S. 280, 303, 96 S.Ct. 2978, 2990, 49 L.Ed.2d 944 (1976).

The principal opinion cites several Georgia cases which uphold the death penalty even after one, or more, aggravating circumstance was found to be improperly considered. Georgia stands alone in arriving at this result. The first four Georgia cases cited in footnote 5 of the principal opinion rely on the fifth case, *Gates v. State*, 244 Ga. 587, 261 S.E.2d 349 (1979), *cert. den.* 445 U.S. 938, 100 S.Ct. 1332, 63 L.Ed.2d 772 (1980). *Gates*, however, did not address how an aggravating circumstance which had been improperly submitted to, or considered by, a jury may affect the decision-making process of the jury; it merely makes the unsupported conclusion that,

"Where two or more statutory aggravating circumstances are found by the jury, the failure of one circumstance does not so taint the proceedings as to invalidate the other aggravating circumstance found *and the sentence of death based thereon*." [5]

**5.** In arriving at this conclusion, the *Gates* court cited *Gregg v. State*, 233 Ga. 117, 210 S.E.2d 659 (1974), *aff'd sub nom.* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). *Gregg*, however, is inapposite. In that case, there were two different counts of capital murder. The death penalty had been given on both counts.

261 S.E.2d at 358 (emphasis supplied). I question that a court can state with certainty that a jury invariably based its imposition of a death penalty on any *one* of multiple aggravating circumstances when the jury found multiple aggravating circumstances.

Furthermore, the principal opinion implies that our death penalty statute is patterned after Georgia's and therefore it follows that we should hold the same as Georgia. I cannot agree. This is Missouri, not Georgia. Georgia's traditions and proclivities are not ours. According to the most recent Death Penalty Reporter (Vol. 1, No. 8) at p. 26, ninety-two people are on death row in Georgia compared to eight in Missouri. With all due respect to our sister state, we should not necessarily walk Georgia's path just because our statutes are similar.

In any case, the similarity between our statute and Georgia's is irrelevant here. Every state with a death penalty statute, including the three which hold contrary to Georgia, permit consideration of multiple aggravating circumstances. *See, e. g.,* Ala. Code tit. 13, §§ 11–4 and 11–6 (1975); Fla. Stat.Ann. § 921.141 (Supp.1981); N.C.Gen. Stat. § 15A–2000 (Supp.1979). There is nothing peculiar about Georgia in this regard. The only peculiarity is that we are proposing to hold as Georgia alone does. In my opinion, the reasoning found in the cited cases from Alabama, Florida, North Carolina, the Fifth Circuit and in the other cases discussed below goes unanswered by both the Georgia cases and the principal opinion.

Where one of the aggravating circumstances found by a death sentencing jury is improper, the situation is analogous to one where a general verdict of guilty has been returned by a jury instructed on alternative theories of conviction, one but not all of which permitted guilt to be rested upon an

When the Georgia Supreme Court reversed the death penalty on one count because of improperly submitted aggravating circumstances, it affirmed the death penalty *on the other count* which was based on properly found aggravating circumstances. Such is a completely different situation from *Gates* or the instant case.

unconstitutional ground. Under *Stromberg v. California*, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931) and many cases following it, such a conviction will not stand.

An analogy can be made to Missouri policy in civil cases that a "jury should not be instructed on any theory of recovery or defense which is not supported by the evidence . . . ." *Hounihan v. State Farm Mutual Automobile Insurance Co.*, 441 S.W.2d 58, 63 (Mo.App.1969); *See also* Committee's Comment to MAI 1.02, p. 7 (2nd ed. 1969):

> "The Committee believes that the jury should not be instructed on a theory or defense not supported by the evidence and that any such submission should be reversible error. A theory of recovery or defense should not be submitted unless it can stand alone. The present practice has been a crutch which has done little but confuse by presenting imaginary issues for the jury's determination."

Further, "[i]nstructions on issues not supported by any evidence tend to authorize the jury to rove in reaching their verdict." *State v. Higdon*, 356 Mo. 1058, 204 S.W.2d 754, 755 (banc 1947).

In *Chilton v. Wright*, 480 S.W.2d 1, 6 (Mo.1972), written by the author of the principal opinion herein, the liquor license of Modene Gatewood and Edd C. Chilton was revoked by the supervisor of liquor control on two grounds: (1) unlawful selling for resale and (2) unlawful possession of refilled containers. Our review showed a lack of substantial evidence to support the first ground, although there was substantial evidence to support the second ground. The license revocation was reversed and the cause remanded for reconsideration by the liquor supervisor, for the reason that the license was revoked "on the strength of two violations, one of which has been found unsupported". The supervisor was directed to reconsider the matter for assessment of penalty, if any, on the basis of the single charge supported by the evidence.

In the *Chilton* case it was evident that the supervisor had revoked the license on two grounds, but one was bad. It could not be determined what he would have done had he limited his consideration to the only violation shown. Likewise in the case before us, the jury, as required by MAI—CR2d 15.48 and by the statute, § 565.012.4, set forth in its verdict the aggravating circumstances found beyond a reasonable doubt. The jury set forth two such circumstances. One of these circumstances, however, the "agent and employee" circumstance, is unsupported by the evidence. Here, as in the *Chilton* case, the death penalty (there it was the liquor license revocation) was imposed "on the strength of two violations (aggravating circumstances), one of which has been found unsupported." If we reverse and remand for reconsideration where only a liquor license is involved, surely we can do no less where a life is at stake.

Submitting to the jury aggravating circumstances not supported by the evidence can only create confusion in the minds of the jurors and may impermissibly tip the balance in favor of the death penalty. We cannot say that the jury would have given defendant the death penalty in this case had the agent or employee aggravating circumstance not been submitted. When the death penalty is before us, we should not affirm on the basis of conjecture.

## IV

While I agree with the avowal of the principal opinion that we should not and will not permit § 565.012.2(7) to become a "catch all" subsection on aggravating circumstances, I do not agree that we discharge our duty under § 565.014.2(3) to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases" by restricting our consideration to cases in which both death and life imprisonment were submitted to the jury and which have been affirmed on appeal. This is too limited in scope. It eliminates from consideration all cases in which the state waived the death penalty, all cases in which life imprisonment was given and no appeal taken, all capital cases pending before us in which life imprisonment was given, and all cases in

which capital murder was charged but the jury found defendant guilty of a lesser crime than capital murder. All these examples are cases in which the jury convicted defendant of murder but chose not to impose the death penalty. The purpose of appellate review of the death penalty is to serve "as a check against random or arbitrary imposition of the death penalty." *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). It is our solemn duty, in my opinion, to guarantee that similar aggravating and mitigating circumstances do not bring about a death sentence in one case and life imprisonment in another. The statute and the Supreme Court cases require that the death penalty be imposed with an even hand. *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). We are required to make a proportionality review. *Gregg v. Georgia, supra.*

By "similar cases" is meant similar capital murders, not limited only to those where both death and life imprisonment were submitted to the jury and then affirmed on appeal, whichever way the case went on punishment. The evil deed is the murder and what accompanied it and that, as well as the defendant, is what must be looked at in comparing what one defendant received in punishment under a capital murder charge with what another received. The fact that a capital murder defendant does not get the death penalty or gets a new trial or that the state waived the death penalty in his case or that his case is still pending before us does not mean that we can ignore his case in making our comparison. Once we accept the idea, as we must, that the death penalty cannot be inflicted at random, or arbitrarily or inconsistently, then necessarily we must take into consideration all capital murders we know about. We are furnished with a special assistant for this purpose. Section 565.014.6. He is to accumulate the record of all capital cases in which sentence was imposed after May 26, 1977. The statute says "sentence was imposed". It is not limited to capital murders where the death sentence was imposed.

As said in Baldus, et al., Identifying Comparatively Excessive Sentences of Death: A Quantitative Approach, 33 Stan.L.Rev. 1, 20–21 (1980),

"The efficacy of the review procedure also depends on the number of 'similar' cases used in the comparison and the completeness of the information available concerning those other cases. In other words, the apparent efficacy of the protection against comparative excessiveness which proportionality review can theoretically provide may be misleading. Whether defendants sentenced to death really receive that protection depends almost entirely upon the thoroughness and accuracy of the actual review process."

Realizing as I do that to do so is no easy task, nevertheless, the principal opinion articulates no standard by which the review was made in this case or how the cases mentioned in the opinion in which a life sentence was given support the affirmance of the death penalty.

We see one capital murder case after another in which the killing was horrible or atrocious or whatever other color word comes to mind and in which the defendant received life imprisonment, not death. *See*, for example, *State v. Strickland*, 609 S.W.2d 392 (Mo. banc 1980) (one victim shot in the head; in an adjoining room three other people were tied up and two of them were shot in the head; the third escaped when the gun pointed to her head did not fire, although she was later hit with a shotgun blast; state waived death penalty); *State v. Holmes*, 609 S.W.2d 132 (Mo. banc 1980) (sixteen year old victim stabbed sixty-four times with an ice pick; state waived death penalty); *State v. Baskerville*, No. 61661, pending before this court on life imprisonment sentence (multiple murders including seven year-old boy and his mother; boy was last to be killed and begged for his life).

In *State v. Mitchell*, 611 S.W.2d 223 (Mo. banc 1981), the 24 year-old defendant was convicted, life sentence, along with another (*see State v. Turner*, No. 61974, pending, life sentence) of the capital murder of the

owner of a tobacco store and his employee, aged 72 and 61 respectively. The murders were committed in the course of a robbery. Both victims received blows to the head with a blunt instrument, such as a beer bottle, both had fractured ribs, and both received multiple stab wounds, apparently from a broken beer bottle. One victim was stabbed fifteen times; the other was stabbed five times in the chest and several times in the abdomen and other parts of the body.

In *State v. Downs*, 593 S.W.2d 535 (Mo. 1980), the defendant was convicted of the capital murder of a married couple and their eighteen year-old daughter, with a life sentence. The defendant and others robbed the store owned by the couple and shot them each in the head. When the daughter returned ·from her classes and approached an opened door she was grabbed by defendant and another and pulled into the store where her parents lay dead. The girl fell to her knees and begged for her life. The defendant put a gun to her head and shot her.

It seems to me that what Mr. Justice White concluded in *Furman v. Georgia*, 408 U.S. 238, 313, 92 S.Ct. 2726, 2764, 33 L.Ed.2d 346 (1972) (concurring) remains the fact. He said there that

"[t]he death penalty is exacted with great infrequency even for the most atrocious crimes and that there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not."

As said at the outset, I would reverse and remand for a new trial.